**In re FROSTY MORN MEATS, INC., Bankrupt.**

**Bankruptcy Nos. 78–3139, 78–3455, 78–3510 to 78–3512, 78–3539 to 78–3542, 79–3003, 79–3016, 79–3019, 79–3105, 79–3123 to 79–3125, 79–3183, 79–3184, 79–3198, 79–3199, 79–3298, 79–3321, 79–3322, 79–3341, 79–3657, 80–3303 and 80–3304.**

United States District Court,
M. D. Tennessee,
Nashville Division.

Nov. 25, 1980.

Margaret Huff, Asst. U. S. Atty., Nashville, Tenn., for Dept. of Agriculture.

M. Taylor Harris, Jr., and G. Rhea Bucy, Nashville, Tenn., for trustee.

N. Houston Parks, Columbia, Tenn., L. Gino Marchetti, Jr., Robert H. Jennings, Jr., and Martin & Cochran, Nashville, Tenn., Representative attorneys for creditors.*

## MEMORANDUM

MORTON, Chief Judge.

These cases involve actions taken by the Bankruptcy Judge in presiding over the remains of Frosty Morn Meats, Inc., the Bankrupt.

On November 4, 1977, Frosty Morn filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq. After an extended period of time during which no effort was made to file a plan of arrangement, Frosty Morn was declared a bankrupt under the Bankruptcy Act by order dated May 10, 1978. On May 19, 1978, Irvin A. Deutscher was appointed Trustee of the bankrupt debtor. In the period from November 4, 1977, to May 10, 1978, some pertinent actions occurred. Frosty Morn was permitted to operate the business as debtor-in-possession (Order No. 2) but was ordered to provide an accounting. The court postponed the beginning of the 15-day notice period specified in 7 U.S.C. § 196(b) pending receipt of the accounting. The debtor was restrained from encumbering the trust assets created by 7 U.S.C. § 196(b). By order entered later, the court fixed the inception of the 15-business-day period as November 21, 1977. On December 21, 1977 (Order No. 34), Irvin A. Deutscher was appointed Receiver of the assets and property of Frosty Morn. By order entered January 25, 1978, nunc pro tunc December 19, 1977, Samuel W. Bartholomew, Jr., was appointed escrow agent for the funds of the trust created by 7 U.S.C. § 196. So at this time, there was a recognition of two types of assets, i. e., assets of Frosty Morn Meats, Inc., to be held by Deutscher, the receiver, and assets of the trust for the producers, etc., to be held by the escrow agent. On January 9, 1978, the Bankruptcy Judge ordered that all claimants asserting an interest in the trust fund, 7 U.S.C. § 196(b), file a proof of claim on a prescribed form by February 13, 1978. To this point no appeals were filed to attack the orders of the court.

In an adversary proceeding, *Citibank, N. A., v. Irvin A. Deutscher, Receiver*, a stipulated settlement was tendered to the bankruptcy court. It was approved by the court (Order No. 75) on March 10, 1978, and became binding on all parties since no appeal was taken therefrom. In the stipulation signed by Deutscher and presented the court is the following language:

> 8. The Receiver acknowledges that he has previously segregated and set apart the sum of $2,743,122.00, which shall be held pending further order of this court in connection with alleged claims by livestock suppliers seeking priority under the 1976 amendments to the Packers and Stockyards Act, particularly 7 U.S.C. § 196.

Section 9 of the amended stipulation of settlement filed March 10, 1978, contained the following:

> In consideration of the establishment of the escrow funds established in paragraph 6, 7 and 8 above, Citibank agrees it will not, directly or indirectly, make payment of any sums which might be due to the possible beneficiaries of such escrow funds and seek to charge the same to the Receiver or to the account of the Debtor under this paragraph.

The reference to paragraph 8 refers to previously quoted paragraph 8 by which the Receiver set aside the sum of $2,743,122.00 to pay the trust fund (7 U.S.C. § 196) beneficiaries. In approving the Stipulation of Settlement, *supra*, the court made certain findings of fact, to wit:

> 1. By Order No. 39 entered herein January 9, 1978, all persons claiming the benefits of 7 U.S.C. § 196 were directed to file with this court a proof of claim on or before February 13, 1978. A notice to this effect was issued January 9, 1978, and mailed in cooperation with the Packers & Stockyards Administration, U.S.D.A., to all persons

---

* Because of space limitations, not all attorneys for the numerous creditors can be listed.

known to have such potential claims. As of February 17, 1978, some 321 such claims had been filed with this court. The notice of hearing on approval of the Stipulation of Settlement (hereinafter, "Settlement") was mailed to all persons who had filed such claims as of February 17, 1978. In addition, the notice was mailed to all attorneys who have entered appearances in this proceeding.

2. At the meeting of creditors held herein on November 29, 1977, the court heard testimony to the effect that the maximum amount of claims which might be asserted against funds of the debtor under 7 U.S.C. § 196 was $2,743,122.00. Transcript, pp. 7–9. At that hearing the U. S. Attorney specifically agreed that an escrow of this sum, which is approximately $10,000 greater than the estimate of the Packers and Stockyards Administration as to the maximum amount of potential claims under 7 U.S.C. § 196, was adequate to protect the rights of unpaid livestock sellers under 7 U.S.C. § 196. Transcript, pp. 13–14. The court further notes that the aggregate amount of claims filed pursuant to Order No. 39 and the notice of January 9, 1978, is considerably less than $2,743,122.00.

3. In July 1975, the debtor entered into a short term financing arrangement with Citibank which is evidenced by documents collected as Exhibit A to Citibank's proof of claim herein. This arrangement provided for interest to accrue on any indebtedness thereunder of the debtor to Citibank at the rate of one-thirtieth (⅟₃₀) of one percent (1%) per day. The arrangement also provides for reimbursement to Citibank of all costs of collection, including reasonable attorneys' fees. As security for the repayment of any indebtedness incurred under this arrangement, the debtor granted Citibank a first-lien security interest in inventory, accounts receivable, and the proceeds thereof. Citibank was also granted second-lien deeds of trust on certain real property of the debtor to secure this indebtedness. As of November 4, 1977, the principal balance of the indebtedness to Citibank hereunder was $4,192,189.38. In addition, the debtor was chargeable with the sum of $398.56, representing returned checks, which sum had previously been credited to the debtor's account by Citibank.

4. The Receiver testified that with the assistance of his appointed legal counsel, he had investigated the documents creating the security interests referred to hereinabove and the evidences of the perfection thereof and had found no basis upon which to question either the creation or perfection of the security interests.

5. Since the filing of the original petition herein and during the period in which the debtor remained in possession, Citibank continued to receive various funds of the debtor, including the daily collections of accounts receivable and sales of inventory. The total amount of such funds received by Citibank after November 4, 1977, is $7,711,014.47. On November 21, 1977, the amount of such funds collected and held by Citibank for the first time exceeded the principal indebtedness under the short-term financing arrangement and did so on each day thereafter.

6. By order of November 10, 1977, this court authorized the debtor as debtor-in-possession to issue a Certificate of Indebtedness (hereinafter, "Certificate") in the principal amount of $650,000 to Citibank in consideration of new advances in said amount from Citibank to the debtor-in-possession. The order provided that the property securing indebtedness under the short-term financing arrangement should stand as security for repayment of the Certificate. The Certificate provided that interest would accrue on the indebtedness thereunder at the rate of five percent (5%) above the prime interest rate charged by Citibank to substantial commercial borrowers from time to time.

In addition, the court made certain conclusions as follows:

1. All amounts which are proposed to be paid to Citibank under the terms of the settlement constitute indebtednesses, the repayment of which is secured by valid and perfected first-lien security interests in the accounts receivable and inventory of the

debtor, and in the proceeds thereof, and by valid and perfected second-lien security interests in certain real property of the debtor.

2. Although in his testimony the Receiver admitted that there is a possibility that some of the funds in question, which are proposed to be applied in payment of indebtedness to Citibank as a part of this settlement, may represent proceeds of livestock purchased by the debtor in cash sales, no party who appeared in opposition to approval of the settlement made any specific showing to that effect. Since the statutory trust created by 7 U.S.C. § 196 extends only to livestock purchased in cash sales, or the proceeds thereof, there has been no showing that any of the funds in question are actually subject to the trust provisions of 7 U.S.C. § 196.

3. Laying aside the considerations set forth in paragraph 7 above, the court is of the opinion that the potential beneficiaries of the statutory trust are fully protected by the terms of the Stipulation in that, as a part of the settlement, the Receiver will set apart the sum of $2,743,122.00, which shall be held until all claims made under 7 U.S.C. § 196 have been fully adjudicated and determined. As found hereinabove, the sum of $2,743,122.00, exceeds the estimate of the Packers and Stockyards Administration as to the maximum amount of all potential claims under 7 U.S.C. § 196. In addition to the sum of $2,743,122.00, the Receiver is holding collections of accounts receivable of the debtor in excess of $300,000; like the former sum, this $300,000 is arguably subject to the statutory trust and may be available to satisfy the claims of beneficiaries thereof. Also, these claimants may have resort to the debtor's 7 U.S.C. § 204 bond, which is in the penal amount of $680,000. Neither 7 U.S.C. § 196 nor the regulations thereunder make any specific prohibition of payment of secured debt in advance of payment of claims thereunder, especially where there appear to be sufficient funds on hand to satisfy the claims of both. The liquidation and allowance of the claims under 7 U.S.C. § 196 promises to be a long, involved process. In the opinion of this court, delay of the approval of the proposed settlement until that process is completed would seriously prejudice the prospect of this debtor's rehabilitation and will needlessly subject the estate to further claims by Citibank for interest, costs, etc. Therefore, the court concludes that the objections to approval of the settlement should be overruled.

4. It is in the best interests of the debtor and of its creditors, for reasons set forth hereinabove, that the settlement be approved.

To this point in the administration of the affairs of Frosty Morn and the trust (7 U.S.C. § 196), no appeals were filed to the findings of fact, conclusions of law, or other actions or determinations by the Bankruptcy Court. With this state of the record and by order of this court, the Honorable Clive W. Bare, Bankruptcy Judge, became the judge to which this matter was assigned. By agreement of the plaintiffs the class action adversary proceeding seeking to establish the 7 U.S.C. § 196 trust was dismissed. All parties, including the Trustee, Deutscher, briefed the legal questions involved in the trust. Judge Bare made a legal determination as to the existence of the trust and its assets and fixed a date for the filing of objections to the claims against the trust. The Trustee filed form exceptions. Thereafter, the judge, after evidentiary hearings, adjudicated the amounts of recovery. The Trustee has filed 22 appeals.

■ This court has set forth in some detail certain events and actions by the Bankruptcy Court prior to the entry into the case of Judge Bare because of the present posture of the Trustee. It is pertinent that Deutscher as Receiver, when this case was proceeding under Chapter XI, can rise no higher than Deutscher as Trustee, when the court placed Frosty Morn in straight bankruptcy. His legal positions cannot change. His failure to appeal from adverse findings of the Bankruptcy Judge when he was Receiver binds him as Trustee of the same debtor estate.

Of particular interest to the court is that as early as January 9, 1978, the Bankruptcy

Court ordered all trust fund (7 U.S.C. § 196) claimants to file proof of claim in a specified form. No appeal was taken therefrom. By order of April 27, 1978, in the adversary proceeding entitled *Powers et al. v. Frosty Morn Meats, Inc., and Irvin Deutscher, Receiver*, the proceeding was sustained as a class action to determine "whether the trust established by 7 U.S.C. § 196(b) exists and is valid in the instant Chapter XI proceeding, and whether the alleged trust should be impressed upon the assets of the debtor." (Memorandum dated April 27, 1978). Thereafter on May 10, 1978, the Chapter XI status of the debtor ended, and it was declared a bankrupt. On August 4, 1978, the Honorable Clive W. Bare, Bankruptcy Judge, entered an order dismissing the class action. This order in part is as follows:

> This matter came on to be heard as a part of the pre-trial conference on July 28, 1978, and, after discussion of counsel concerning the setting of early hearings of the unpaid livestock sellers claims and after the agreement to file stipulation of facts and briefs of law concerning the statutory trust and after it was clear that the purpose of the class action will have been accomplished without the necessity of pursuing the same any further, and upon motion of the parties plaintiff to dismiss this complaint, it is . . . .

No appeal was taken from this action. Briefs were filed, and the legality of the trust was adjudicated. At this point there existed a trust fund against which many claims had been filed.

■ The appellant Trustee asserts certain alleged procedural deficiencies which he contends mandates, as to certain trust fund claimants, a contrary result to that reached by Judge Bare. It appears that certain claimants did not appear at the evidentiary hearing to introduce proof to sustain their claim. The Trustee in support of its exceptions to the claims filed certain "waivers" of trust participation allegedly executed by the "sellers" prior to or contemporaneously with the sale of cattle to Frosty Morn. The appellant asserts that by filing objections to the claims, each such claim became an adversary proceeding.

Rule 701 of Bankruptcy Rules. When claimants did not appear at the hearing, appellant contends the mandatory judgment by default rule, Rule 755, applied. Thus he asserts that the Bankruptcy Judge was compelled to automatically enter a judgment against the claimant, and no further proceedings as to those claimants were proper.

The court disagrees. After the adjudication of the legal existence of the trust and its contents, all that remained to be accomplished was to distribute the funds to those entitled. This is the same type of distribution required to be made of the assets of bankrupts to creditors who have filed claims. In a bankruptcy case the congressional scheme for claims and distribution to creditors is outlined by Rules 301 *et seq.* of Bankruptcy Rules. A proof of claim is filed and constitutes prima facie evidence of the validity and amount of the claim. It is automatically allowed unless an objection is filed. Such objection to the allowance of a claim for the purpose of distribution must be in writing. If the objection does not also seek affirmative relief against claimant as delineated in Rule 701, the proceeding is not an adversary proceeding. Rule 306. The objections filed by the Trustee, which remained viable after the validity of the trust had been adjudicated, consisted of (a) waiver (b) credit sale (c) duplication (d) insufficient documentation. This type type of defense seeks no demand for relief of the type specified in Rule 701, but, in substance is of the same nature as a defense of payment. The Advisory Committee's note under Rule 701 is in pertinent part as follows:

> Except as provided in Rules 121 and 914 Part VII does not govern contested proceedings in the court of bankruptcy other than those described in this rule. Thus, proceedings initiated by the filing of an objection to defeat or reduce a claim rather than to seek an affirmative money judgment or recovery of property, and proceedings under Rule 604 to require a prebankruptcy liquidator to account to the court for the disposition of the property of the bankrupt (*see, e. g.,*

*In Re Ira Haupt & Co.*, 287 F.Supp. 318 (S.D.N.Y.1968), appeal dismissed 405 F.2d 493 (2d Cir. 1968)) and under Rule 220 to examine and determine the reasonableness of compensation paid or promised by a bankrupt to an attorney at law (*see, e. g., Davis v. Negin*, 357 F.2d 154, 155 (6th Cir. 1966)) certiorari denied 87 S.Ct. 51, 385 U.S. 824, 17 L.Ed.2d 60, are not subject to the rules in Part VII. The procedure for handling most objections to claims and for their reconsideration is prescribed by Rules 306 and 307. The procedure for handling exemptions is prescribed by Rule 403.

■ Congress did not intend that a creditor who files a proof of claim be forced to endure an adversary proceeding, i. e., a full scale trial after a complaint and answer, and a subsequent war of paper. To the contrary, the creditor can file a claim, objections can be filed thereto, and a speedy disposition thereof by the court after hearing can be demanded and received.

The Trustee filed form exceptions to all claims to participate in the distribution of the 7 U.S.C. § 196 trust. It was headed "Objection to Allowance of 'Trust Fund' Claim." A notation appears thereon that "only checked items apply." Without exception the first three items deal with the validity and effect of the 7 U.S.C. § 196 trust. As stated before, these three items without objection as to procedure and by agreement were decided by Judge Bare pursuant to order of August 4, 1978. The other items deal generally with waiver, credit sales, duplication, and insufficient documentation. However, item 14 with wording "other" is followed by this phrase: "In addition to the grounds set forth above, Trustee expressly reserves the right to object to allowance of said claims upon any other ground which may subsequently be made to appear at or before the hearing hereon." As stated before, these remaining objections do not fit the mold for adversary proceedings as contemplated by Congress. This court finds that the Bankruptcy Judge acted properly in the procedure used for adjudicating claims to the trust fund and thus Rule 755 had no application.

The substantive issues raised by the appellants fall into three categories. The first is that Congress lacked the constitutional authority to enact the Packers & Stockyards Act and that it impaired the obligation of contracts held by term lenders who claimed prior constitutional security interest in the assets of the trust fund. The second is that the "trust" created by Section 8 of Public Law 94–410 is invalid against the Trustee under Section 67(c)(1)(B) of the Bankruptcy Act. The third is that the rights created by Public Law 94–410 (7 U.S.C. § 196(b)) are invalid because they conflict with Section 64(a) of the Bankruptcy Act. The fourth is that the Judge erred because he did not require claimants to trace the proceeds of their respective sales into the trust fund. The fifth is that certain "blanket waivers" of the provision of the Packers & Stockyards Act were held to be obtained by fraud and thus ineffective.

■ The first contention of the appellant that the Act is unconstitutional and impairs the obligation of contract must fail. Initially it is noted that all of the alleged prior security lien holders have been paid in full. Thus what remains is the question of whether certain funds are assets of the trust fund, 7 U.S.C. § 196(b), or are general assets for distribution to creditors. The Honorable Clive Bare, Bankruptcy Judge, authored a comprehensive opinion addressing this subject which was filed in the court below on August 31, 1978. This opinion is attached hereto as Appendix A, made a part hereof as fully as if copied verbatim herein, and is adopted as the opinion of this court.

■ The second and third contentions of appellant can be addressed jointly. The substance is that the trust fund, 7 U.S.C. § 196(b), is in conflict with sections 67(c)(1)(B) and 64(a) of the Bankruptcy Act, and thus invalid. This question as to Section 67(c)(1)(B) was addressed in the opinion, Appendix A hereto. The same reasoning and determination applies to Section 64(a) of the Bankruptcy Act. This contention must also be denied.

■ The fourth contention of appellants is that claimants to the trust fund must be required to trace the proceeds of their sales into the trust fund. This question was likewise addressed in the opinion of Judge Bare, Appendix A hereto. The court adopts that opinion but would reiterate the following: The legislative history and the Business Meetings of the Committee on Agriculture clearly reflect that, in the event of a bankruptcy, the records required by the Act would be susceptible to a simple audit to reflect the loss of sales and thus the trust assets. Congress did not intend that because of the illegal failure to keep the appropriate records the beneficiaries of the Act would be deprived of their assets. Clearly, Congress intended that all cash sales would be the source of payment for the unpaid sellers. Thus, this court agrees with the determination of the Bankruptcy Judge and declines to impose an impossible burden on claimants by judicial decree not intended by Congress. This contention is overruled.

The fifth claim by appellants involves the so-called "blanket waivers" or extension of credit agreements. Initially, it is important to note that the appellant has abandoned any claim of waiver arising out of the "weigh bill"[1] language asserted in the court below. However, the opinion of the Bankruptcy Judge is attached hereto as Appendix B and adopted by the court as to its factual content. Now turning to the "blanket waivers" and extension of credit agreements question, this court adopts the opinion of the Bankruptcy Judge filed September 14, 1978, Appendix C hereto. In addition, the court feels that the evidence in this record clearly and overwhelmingly reveals the following. Frosty Morn realized its precarious condition. It could be closed at the caprice of Citibank. It required weekly funding from Citibank. At the behest of Citibank it embarked on a course of action to deprive its sellers of a legal right under 7 U.S.C. § 196(b). It unleashed its representatives on the public to make representations to obtain waivers of the trust provisions of 7 U.S.C. § 196(b). These representations followed the following pattern:

(1) After delivery of the livestock and its comingling with other livestock, a "weigh bill" was presented to be signed as a condition precedent to obtaining simultaneously a check for payment. A representation was made, if questioned, that the "weigh bill" was necessary for payment and nothing was charged. In fact, the "weigh bills" were written extensions of credit. The representations were deliberately false.

(2) On some occasions "blanket waivers" or extension of credit agreements were obtained from sellers or prospective sellers on the representation that "the P & S people demanded or wanted it." ("P & S" referred to Packers & Stockyards.) This is a clear reference to a governmental agency and was false.

(3) On other occasions, the sellers or proposed sellers were told that if they did not sign a waiver Frosty Morn would not buy their livestock. This representation was false for two reasons. Without the waivers, Frosty Morn continued to and intended to continue to buy the livestock. Secondly, the waivers were being obtained at the behest of Citibank. Citibank insisted that 80% of Frosty Morn's purchases be on credit. This left 20% for cash sales. This fact was not made known to the sellers. Thus this approach was false.

(4) On some occasions the waivers were obtained on the representation that it was "a requirement of the Packers & Stockyards Act." This is patently false.

(5) On no occasion was there an explanation that the "waivers" constituted an extension of credit. In fact, the representations were that "nothing is charged."

■ Clearly, the "waivers" invalidated by the Bankruptcy Judge were the result of fraud, misrepresentation and deceit. These were representations of material facts. The representations were false and were made with the knowledge that they were false. Certainly they were at least made recklessly and carelessly. The sellers were

1. The appellants have abandoned the "weigh bill" waiver theory. See Appendix D.

reasonable in relying thereon. *Edwards v. Travelers Ins. Co.*, 563 F.2d 105 (6th Cir. 1977); *Rose v. Foutch*, 4 Tenn. 495 (1926) (*cert. denied* 1927); *Haynes v. Cumberland Builders*, 546 S.W.2d 228 (Tenn.) (*cert. denied* 1977); *Simmons v. Evans*, 206 S.W.2d 295 (Tenn.1947). Thus, these "waivers" or extensions of credit agreements are not binding on these sellers.

Finally, the appellant contends that stockyards, market agencies and dealers must be treated differently from the individual sellers and are a special class of claimants. The Bankruptcy Judge rejected this contention, and the court adopts that opinion. It seems clear from the Act and the supporting legislative history that Congress intended to protect the entire chain of commerce from the individual producers to the slaughter house. Congress did not intend to have the rights of sellers diluted by questions concerning the relative rights between persons in the chain. Congress intended that the proceeds from the sales be available through the trust fund mechanism for distribution to the sellers. This contention is overruled.

The Trustee evinces particular exasperation because the Bankruptcy Judge allegedly decided some of the issues and factual items prior to the filing of briefs and some answers to interrogatories propounded to some of the claimants by the Trustee. Without in any manner suggesting that the decision of the Bankruptcy Judge would have been affected if such assertions were factual, the decision of this court in affirming the judgment below is made with full cognizance of the entire record as certified on appeal.

The Trustee attacks the decision below with specific reference to "twenty businesses." This attack is basically three-pronged, i. e., sophistication, actual knowledge, and presumed knowledge as to and of the Packers and Stockyards Act.

The sophistication argument is based on the premise that these business operators were sophisticated in that they were wise in the world of business. A careful examination of the evidence as to the successful claimants fails, except for possibly two or three instances, to reflect any degree of sophistication as that term is defined. Sophisticated is defined in Webster's Third New International Dictionary, Unabridged, as:

> Deprived of motive or original simplicity; as (a) highly complicated, many-sided: complex ... (b) worldly-wise, knowing.

However, even persons described as sophisticated can be and in this case, if there were any subject to such description, were misled by a trusted company, Frosty Morn, through a fraudulent scheme to obtain signatures on an alleged waiver cunningly structured by attorneys and deliberately made ambiguous to the members of the stockyard community. Furthermore, such scheme, as previously described herein, was designed to and did mislead those to whom it was directed with such success that it destroys any defense of actual knowledge. Likewise, the success of the scheme in brainwashing its targets would eliminate any alleged defense of mandatory presumptive knowledge of the Act and regulations promulgated thereunder. By this statement this court does not imply in the factual background of these matters that a presumption of any such import exists. This court has examined the memoranda and judgments of the court below as to the "twenty businesses" and finds them correct and proper.

Included in the list of cases in the caption of this matter are certain appeals by some creditors of Frosty Morn alleging that the Bankruptcy Judge was in error in denying their claims to be included as trust fund participants. The Bankruptcy Judge denied these claims primarily because these individuals had knowingly executed waivers and had knowingly extended credit which prevented their participation as trust fund participants. After considering the record in the case, the court finds that the factual determinations by the Bankruptcy Judge are not clearly erroneous and are substantially supported by the facts in this case.

An appropriate order will be entered dismissing all appeals.

## APPENDIX A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

Filed Aug. 31, 1978

In re

Bankruptcy No. BK 77–31707

FROSTY MORN MEATS, INC.

Bankrupt

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

### I

The controversy before the Court involves an interpretation of Pub.L. 94–410 (7 U.S.C. § 196), enacted as an amendment to the Packers and Stockyards Act of 1921, and the asserted claims of unpaid sellers of livestock in an escrow account established pursuant to court order.

■ On August 15, 1921, Congress enacted the "Packers and Stockyards Act, 1921," c. 64, 42 Stat. 159 (7 U.S.C. § 181 et seq.), and the statute was immediately challenged as unconstitutional. In *Stafford v. Wallace*, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735 (1922), the Supreme Court responded and found the statute constitutional, the subject matter having to do with interstate commerce. "(W)e think the Act clearly within Congressional power and valid." The dominant purpose of the statute was to secure to patrons of stockyards the prescribed stockyard services at just and reasonable rates, *U. S. v. Morgan*, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939), mandate conformed to 32 F.Supp. 546, rev'd on other grounds, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429. The statute was aimed at monopoly practices. *Denver Union Stockyard Co. v. Producers Livestock Marketing Association*, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771 (1958). The statute, however, was not intended to su-persede or disturb state law respecting valid chattel mortgages on livestock delivered at public stockyards, *Kelly v. Lang*, 62 N.W.2d 770 (ND 1954); *Mason City Production Credit Assn. v. Sig Ellingson & Co.*, 205 Minn. 537, 286 N.W. 713 (1939) cert. denied 308 U.S. 599, 60 S.Ct. 130, 84 L.Ed. 501, rehearing denied 308 U.S. 637, 60 S.Ct. 178, 84 L.Ed. 529.

In January 1975, American Beef Packers went into bankruptcy, leaving producers in 13 states unpaid for a total of over $20 million in livestock sales.[1] Other packer failures between 1958 and 1975 had resulted in losses to livestock producers of an additional $23 million. On September 13, 1976, Congress responded to the "risks created by certain business practices engaged in by members of the packing industry" by the enactment of Pub.L. 94–410. Major changes in the Act were designed to assure livestock producers that they would receive prompt payment for the animals they delivered to packing plants. The committee noted that—

"No individual is engaged in a riskier endeavor or one more vital to the national interest than the producer. And no entrepreneur is so completely at the mercy of the marketplace. The livestock producer, if he successfully combats the vicissitudes of weather, financing, and skyrocketing costs, must sell when his cattle are ready irrespective of the market. His livestock may represent his entire year's output. If he is not paid, he faces ruin. "The meat packing industry is, of course, an integral part of our Nation's agricultural marketing system. What is needed to prevent future producer tragedies, as occurred following the ABP (American Beef Packers) bankruptcy, is legislation that will afford a measure of protection to the livestock producer and feeder and yet not be so restrictive as to reduce competition in the livestock slaughtering business. H.R. 8410 accomplishes this dual objective." *U.S.Code Congressional*

---

1. In this case, General Electric Acceptance (sic) Corporation stood ahead of sellers by virtue of its duly recorded security interest in American Beef Packer's inventory (livestock and derivative products) and receivables.

& *Administrative News*, 94th Congress, 2nd Session, 1976, pp. 2267, 2272.

The Packers and Stockyards Act, 7 U.S.C. § 181, et seq., amended by Pub.L. 94–410 (hereinafter referred to as the P & S Act), enacts that all livestock purchased by a packer in cash sales and all inventories of, or receivables or proceeds derived therefrom, shall be held by such packer "in trust" for the benefit of all "unpaid cash sellers." The purpose of the statute is set forth in § 196(a):

"§ 196. Statutory trust established—Protection of public interest from inadequate financing arrangements

(a) It is hereby found that a burden on and obstruction to commerce in livestock is caused by financing arrangements under which packers encumber, give lenders security interest in, or place liens on, livestock purchased by packers in cash sales, or on inventories of or receivables or proceeds from meat, meat food products, or livestock products therefrom, when payment is not made for the livestock and that such arrangements are contrary to the public interest. This section is intended to remedy such burden on and obstruction to commerce in livestock and protect the public interest."

The trust provision provides that—

"(b) All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers: *Provided*, That any packer whose average annual purchases do not exceed $500,000 will be exempt from the provisions of this section. Payment shall not be considered to have been made if the seller receives the payment instrument which is dishonored. *Provided*, That the unpaid seller shall lose the bene-

fit of such trust if, in the event that a payment instrument has not been received, within thirty days of the final date for making a payment under section 228b of this title, or within fifteen business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, the seller has not preserved his trust under this subsection. The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary."

"(c) For the purpose of this section, a cash sale means a sale in which the seller does not expressly extend credit to the buyer."

On November 4, 1977, Frosty Morn Meats, Inc., a packer, filed a Chapter XI petition in this court, § 301 et seq., Bankruptcy Act (11 U.S.C. § 701 et seq.). Thereafter some 344 claimants, purporting to be unpaid sellers of livestock, filed claims totaling approximately $2,300,000.00. Claimants assert "trust fund" rights under 7 U.S.C. § 196 in the bankrupt's inventory and receivables, the proceeds of which are now held by the trustee.[2] On March 28, 1978, Bankruptcy Judge Kinnard by Order No. 75 approved Stipulation of Settlement that established an escrow of $2,743,122.00 to protect the rights of "potential beneficiaries of the statutory trust" under 7 U.S.C. § 196. Paragraph 8 of that order states:

"... the Court is of the opinion that the potential beneficiaries of the statutory trust are fully protected by the terms of the Stipulation in that, as a part of the settlement, the Receiver will set apart the sum of $2,743,122, which shall be held until all claims made under 7 U.S.C. § 196 have been fully adjudicated and determined. As found hereinabove, the sum of $2,743,122 exceeds the estimate of the Packers and Stockyards Administration as to the maximum amount of all potential claims under 7 U.S.C. § 196. In addition to the sum of $2,743,122, the Receiv-

---

**2.** On November 8, 1977, an order was entered authorizing the debtor to operate its business. Bankruptcy Rule 11–23. On December 21, 1977, Irving A. Deutscher was appointed Re-

ceiver. Bankruptcy Rule 11–18(b). On May 10, 1978, an adjudication in bankruptcy was entered and on May 19, 1978, Mr. Deutscher was appointed trustee of the bankruptcy estate.

er is holding collections of accounts receivable of the debtor in excess of $300,-000.00; like the former sum, this $300,-000.00 is arguably subject to the statutory trust and may be available to satisfy the claims of beneficiaries thereof."

Claimants assert that, during the entire course of these proceedings, the parties and the Court have accounted for the funds in a manner consistent with the trust created by § 196 of the P & S Act; that this position is reflected in orders, agreements, and correspondence.

On August 11, 1978, the trustee of the bankrupt's estate filed objections to the allowance of all "trust fund" claims alleging that—

1. The Third National Bank in Nashville, Bank of Virginia and Branch Banking & Trust Company (collectively referred to as the "Term Lenders") have valid and perfected security interests in the funds which are alleged to constitute the *res* of the trust created by 7 U.S.C. § 196. Such security interests were created and perfected prior to passage of Public Law 94–410 which amends 7 U.S.C. § 196, and secure the repayment of outstanding indebtedness to the Term Lenders. Public Law 94–410 cannot constitutionally be applied so as to subordinate, defeat or otherwise impair such prior contractual security interests, and the said funds should be applied first to reduce the indebtedness to the Term Lenders.

2. Any money or other property which may have been subject to the provisions of 7 U.S.C. § 196, as amended, was commingled by Frosty Morn Meats, Inc. with its money and other property not subject to such provisions, such that it is presently not possible to identify sufficiently the subject money or other property, hence, any trust in such money or other property was lost.

3. Public Law 94–410 which amends 7 U.S.C. § 196 purports to create a statutory lien which is invalid against the Trustee under the provisions of § 67(c)(1)(B) of the Act (11 U.S.C. § 107(c)(1)(B)).

As to certain claimants, the trustee filed other objections alleging failure to assert claim within the statutory time, execution of waivers, incorrect amounts, et cetera. This Memorandum will determine only the objections of the trustee enumerated above and will not address any other objection filed by the trustee. Those matters will be determined in other memorandums and orders.

## II

■ The language of § 196 together with its legislative history conclusively shows that what Congress had in mind in its enactment was (1) to establish a statutory trust in livestock purchased by a packer in cash sales, and inventories of, or receivables or proceeds derived therefrom, for the benefit of unpaid cash sellers until they had received payment in full; (2) to deny priority to a secured lender holding livestock, meat, meat food products, or receivables or proceeds therefrom, purchased by a packer in cash sales but which had not been paid for; (3) to eliminate specific identification of the livestock, carcasses, proceeds or receivables, but instead establish a trust pool for the benefit of the unpaid cash sellers, and (4) to pre-empt State laws in conflict therewith. Do the asserted objections of the trustee defeat the Congressional purpose of this statutory enactment? I think not.

### Constitutionality

■ It is elementary constitutional law that all statutes are presumed to be constitutional, that the burden of establishing their constitutional infirmity is upon the party alleging same, that every inference is in favor of the validity of a duly enacted statute, and that a Court will indulge every rational and reasonable presumption in favor of the constitutional validity of a statute. *Home Tel. & Tel. Co. v. Los Angeles*, 211 U.S. 265, 29 S.Ct. 50, 53 L.Ed. 176 (1908); *First Nat. Bank v. Fellows*, 244 U.S. 416, 37 S.Ct. 734, 61 L.Ed. 1233 (1917).

The trustee asserts that the statute is unconstitutional because it attempts to subordinate, defeat, or otherwise impair the prior contractual security interest of the term lenders. It is somewhat ironical that the trustee asserts the so-called constitutional rights of the term lenders, secured creditors, who assert no security rights in the escrowed funds. The term lenders have been or will be satisfied in full from security interests or liens they hold on other assets belonging to the bankrupt. On August 1, 1978, the trustee was authorized by Order No. 139 to enter into an agreement for settlement of the claims of the term lenders. Paragraph 4 of the Settlement states:

> "The Term Lenders and, to the extent he may have security interests, Neuhoff hereby subordinate their security interests in the Bankrupt's accounts receivable, inventory and proceeds and products thereof, to the extent of the lawful trust fund claims of livestock producers, under the Packers and Stockyards Act, 1921, as amended, Title 7, USCA, Section 196, as such claims may be finally determined by appropriate judicial ruling in a court of competent jurisdiction or the sum of $2,743,000.00, whichever is less."

The trustee lacks standing to challenge the statutory trust imposed by 7 U.S.C. § 196 as violative of the rights of the term lenders. The issue of constitutionality raised by the trustee simply does not exist, insofar as the term lenders are affected.

> "The party who invokes the power [of the courts] must be able to show not only that the statute is invalid but that he has sustained or is in immediate danger of sustaining some direct injury as a result of its enforcement." *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

The trustee has made no showing of injury, and others who conceivably might have standing to challenge the constitutionality of 7 U.S.C. § 196 have not done so. On the basis of lack of standing alone, the trustee's first objection to the trust claims must be overruled.

Although the constitutional issue under the facts of this case does not exist, I find and conclude that, even if the term lenders had asserted claims, the statute is constitutional. Whatever security interests the term lenders possess arise under the Uniform Commercial Code, effective in all states in which Frosty Morn made purchases of livestock. § 9–204(1) of the Code, "After Acquired Property," enacts that a security interest cannot attach until the debtor has rights in the collateral. § 196 was enacted more than two years prior to the purchase of the livestock involved in this proceeding. Thus, the proceeds of the inventory and receivables which comprise the escrowed funds came into existence after the enactment of the statute. The question of whether the statute could affect inventory and receivables in which a security interest had previously attached is not an issue.

 7 U.S.C. § 196 was enacted on the basis of a determination that the bankruptcy of meatpackers, and the consequent adverse effect upon the financial condition of livestock producers, constituted a burden upon, and obstruction of, interstate commerce. The legislative history of 7 U.S.C. § 196 includes the following findings of fact:

(a) "... a packer is able to offer as security for a loan the livestock, meat, meat food products, or receivables or proceeds therefrom, which he has not paid for. The producer, who was responsible for raising, feeding, and caring for the livestock is left unpaid, while secured creditors reap the reward of his labors";

(b) between 1958 and the end of the first quarter of 1975, the failure of meatpackers resulted in losses of over $43,000,000.00 to livestock producers;

(c) such losses, if continued, threatened the ability of livestock producers to provide livestock for slaughter, livestock being the "... single most important source of protein in the American diet ...";

(d) therefore, "... livestock producers occupy a position of unique national importance...." S.R.Rep.No.94–932, 94th Cong., 2d Sess., reprinted in *U.S.Code Congressional & Administrative News*, pp. 2267 at 2271–72.

7 U.S.C. § 196 was enacted to remedy this burden on commerce and protect the national welfare, by creating the trust fund therein provided. This was proper under the commerce power granted to Congress by the Constitution, just as enactment of the other provisions of the P & S Act was a valid exercise of the commerce power.

"Whatever amounts to more or less constant practice, and threatens to obstruct or unduly burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of the danger and meet it." *Stafford v. Wallace,* supra (upholding the constitutionality of the Packers and Stockyards Act of 1921).

The trust established by 7 U.S.C. § 196 does not, by its application, violate any constitutionally protected rights of holders of liens on assets of meatpackers. Prior to the enactment of 7 U.S.C. § 196 in 1976, the term lenders of Frosty Morn may have perfected liens on its after-acquired livestock, inventories of meat and meat products, and accounts receivable and proceeds arising therefrom. However, since 7 U.S.C. § 196 imposed a trust on such assets only prospectively from its enactment, the term lenders did not lose the benefit of the substantive, choate assets securing their loans as of the date when 7 U.S.C. § 196 became effective.

Security interests of the term lenders in the assets of Frosty Morn that came into existence after enactment of 7 U.S.C. § 196, may validly be subordinated to a trust for the benefit of cash livestock sellers, because Article 9–104(a) (as enacted by the law of each state by which the Frosty Morn case could conceivably be controlled) provides:

"This Article does not apply ... (a) to a security interest subject to any statute of the United States ... to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property." Uniform Commercial Code, 1966 Official Text, as amended, § 9–104(a).

This section of the Uniform Commercial Code tacitly recognizes the federal pre-emption doctrine, which itself serves to defeat the trustee's first objection.

"'... [A]cts of the State Legislatures ... [which] interfere with, or are contrary to the laws of Congress, made in pursuance of the Constitution,' are invalid under the Supremacy Clause." *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), citing *Gibbons v. Ogden,* 22 U.S. 1, 9 Wheat 1, 6 L.Ed. 23 (1824).

On the basis of § 9–104(a) and federal pre-emption, the enactment of 7 U.S.C. § 196, to the extent of the trust imposed thereby for the benefit of cash sellers of livestock, prospectively rendered pre-existing floating liens upon Frosty Morn's after-acquired livestock, meat and meat products inventory, and resulting receivables and proceeds therefrom, subordinate to the trust.

Article I, § 10 of the United States Constitution provides, *inter alia,* that no state shall pass any law "impairing the obligation of contracts"; that provision is no limitation upon the powers of the Federal Congress, when acting within the scope of its powers, to enact laws which may operate to impair the obligation of contract. *Continental Illinois Nat. Bank & T. Co. v. Chicago R. I. & P. R. Co.,* 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1934); *New York v. United States,* 257 U.S. 591, 42 S.Ct. 239, 66 L.Ed. 385 (1922). The obligation of contracts is not impaired by congressional statutes passed pursuant to, and in accordance with, the Interstate Commerce clause and the Bankruptcy clause (Article I, § 8, United States Constitution). See 16 Am.Jur.2d, "Constitutional Law," § 434, and numerous cases cited therein. The amendments to the P & S Act of 1976 were enacted pursu-

ant to the enumerated congressional power to prevent burdens on and obstructions of interstate commerce, see 7 U.S.C. § 196(a), and are thus not subject to the constitutional argument raised by the trustee.

■ The payment of trust fund claims out of the present escrow prior to the payment of creditors claiming to have floating liens does not violate the due process clause and, in fact, comports with the state commercial laws under which any such floating liens are perfected.

■ The trustee insists that in enacting § 196 Congress was legislating not only in the field of commerce but in the field of bankruptcy. Although the bankruptcy power of Congress is not without limitation, these limitations have never been fully and precisely defined and, in fact, are probably incapable of definition.

"The trend of decision, however, indicates that the 'subject of bankruptcies' is not strictly bounded by history but has certain commercial, economic and practical elasticity to meet the exigencies of the times. (Citations omitted) It fairly ranges to the entire field of debtor-creditor relief under economic pressure. To the extent of the special power, whatever its fair and actual scope, it is concededly paramount both with respect to state powers and general constitutional restrictions which might hamper its reasonable exercise. (Citations omitted)." Vol. 1, Remington on Bankruptcy, § 11.

■ Nor do property rights involved in bankruptcy proceedings possess any absolute inviolability.

"Property rights do not gain any absolute . inviolability in the bankruptcy court because created and protected by state law. Most property rights are so created and protected. But if Congress is acting within its bankruptcy power, it may authorize the bankruptcy court to affect these property rights, provided the limitations of the due process clause are observed." *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938).

■ The trustee insists that he has a real and substantial interest in the constitutionality of § 196; that, if the funds in controversy are applied to the debts owed to the term lenders, then to the extent of that application other assets encumbered by liens will become available for distribution to general creditors. Although § 196 does not specifically amend the Bankruptcy Act, if it is construed to change the priority rights of creditors when the packer goes into bankruptcy, it is still constitutional. The effect of the statute would be to place unpaid sellers in a priority position ahead of creditors.[3] The absence of an express reference in § 196 to the Bankruptcy Act is of no consequence. The power which Congress exercised clearly exists. In *Marshall v. Owensboro-Daviess Hospital, et al*, 581 F.2d 116 (1978), the Sixth Circuit Court of Appeals cited with approval the decision of the Third Circuit in *Usery v. Allegheny County Inst. Dist.*, 544 F.2d 148 (3d Cir. 1976), cert. denied, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977), that "[i]n exercising the power of judicial review, as distinguished from the duty of statutory interpretation, we are concerned with the actual powers of the national government." In the past Congress has frequently changed the priority rights of creditors and in so doing has merely exercised its constitutional prerogative to regulate and control bankruptcies. United States Constitution, § 8, Art. 1.[4]

As will be noted hereafter, Congress established a statutory trust for the benefit of unpaid cash sellers of livestock.

---

**3.** "It is the Committee's belief that the trust provision (§ 196) offers producers the best protection against packer bankruptcies. They would now receive their money, the money they expected to receive when they sold their livestock, before secured [and unsecured] creditors." *U.S.Code Congressional & Administrative News*, supra, p. 2279.

**4.** § 64 of the Act of 1898 opened with a direction for the payment of all taxes, in effect giving taxes owing by the bankrupt first priority in payment. Costs of administration came second and wages third. By the 1926 amendment, the wage priority was advanced ahead of taxes. The present priorities of § 64 consist of

As enacted by the Congress and as enforced in the present proceeding, § 196 is clearly within the Congressional power and valid.

*Statutory Lien*

The trustee objects to the allowance of trust fund claims because—

"Public Law 94–410 which amends 7 U.S.C. § 196 purports to create a statutory lien which is invalid against the Trustee under the provisions of § 67c(1)(B) of the [Bankruptcy] Act (11 U.S.C. 107c(1)(B))."

§ 67(c)(1) enacts that the following liens shall be invalid against the trustee:

"(B) (E)very statutory lien which is not perfected or enforceable at the date of bankruptcy against one acquiring the rights of a bona fide purchaser from the debtor on that date, whether or not such purchaser exists...."

" 'Statutory lien' shall mean a lien arising solely by force of statute upon specified circumstances or conditions, ...." § 1(29a), Bankruptcy Act.

█ A close reading of § 67(c)(1)(B) of the Bankruptcy Act and § 196 of the P & S Act clearly indicates that § 196 does not create a statutory lien invalid against the trustee in bankruptcy. Rather, § 196 provides for a statutory trust fund which is not an asset of the bankrupt's estate.

█ The plain language, the purpose, and the legislative history of § 196 indicates that Congress intended to create a statutory trust for the benefit of unpaid cash sellers of livestock. A general rule of statutory construction is that a statute should be enforced according to its plain meaning. *Hilliard v. United States*, 310 F.2d 631, 632 (6th Cir. 1962). § 196(b) provides in pertinent part:

"All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products de-

rived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers...." 7 U.S.C. § 196(b). Thus, the statute itself refers to assets to be held "in trust," not assets subject to a lien.

█ Another recognized rule of construction is that a statute should be construed so as to effectuate its purpose. *Environmental Defense Fund v. Tennessee Valley Authority*, 468 F.2d 1164, 1173, 1176 (6th Cir. 1972). In the case at bar, 7 U.S.C. § 196 is intended to remedy the burden on commerce in livestock caused by financing arrangements under which packers encumber, give lenders security interests in, or place liens on livestock purchased by packers in cash sales. 7 U.S.C. § 196(a). Congress chose to remedy this burden on commerce by providing that unpaid cash sellers of livestock would be beneficiaries of a trust established by § 196(b). If the statute were construed as creating a statutory lien invalid against the trustee, the purpose of the statute would be defeated: unpaid cash sellers of livestock would be relegated to the position of creditors of the bankrupt.

The legislative history of § 196 shows that Congress intended to create a statutory trust, the corpus of which is not an asset in bankruptcy. During the committee meetings on § 196 it was stated:

"[I]nasmuch as this is a trust as opposed to a lien, it falls in a different category and therefore it does not substantially affect the Bankruptcy Act. A lien would fall more in the category of affecting priorities such as secured transactions as they are recognized under the Uniform Commercial Code and then take or assume a priority under the Bankruptcy Act.

"But a trust relationship such as that that would arise as a result of section 8 [7 U.S.C. § 196], I think falls outside of the purview of the Bankruptcy Act. The

---

(1) expense of administration, (2) wages (not exceeding $600.00 to each claimant), (3) expenses incurred in obtaining denial or revocation of discharge, (4) taxes (generally limited to three years), and (5) other priorities granted by federal law or, to a landlord, for rent under state law.

trust property would not become an asset in the bankruptcy proceeding." *Business meetings of Packers and Stockyards Act of 1921, As Amended*, Committee on Agriculture, U. S. House of Representatives, 94th Cong., 2d Sess. (December 1976), pp. 130–1.

Where a trust is created by federal law, that law will govern. 4A, Collier on Bankruptcy, § 70.26 at p. 365.

§ 67(c)(1)(B) of the Bankruptcy Act, which provides that certain statutory liens are invalid against the trustee in bankruptcy, does not apply in this case for the reason that 7 U.S.C. § 196(b) establishes a statutory trust, not a statutory lien. Statutory trusts have been held not to be assets of a bankrupt's estate. In *In re Heintzelman Construction Co.*, 34 F.Supp. 109 (W.D.N.Y.1940), the New York Lien Law provided that funds received by a contractor from an owner for improvement of real property constituted trust funds to be applied first to the payment of claims arising from the improvement by subcontractors and others. The Court held that the funds were a trust fund and never were a part of the bankrupt's estate. Id. at 111. The same principle was stated in *Elliott v. Bumb*, 356 F.2d 749 (9th Cir. 1966), in connection with a trust established under a contract: "Although one may become bankrupt, property which is held by him in trust belongs to the beneficiary of the trust." Id. at 753. See also 4A, Collier on Bankruptcy, § 70.25[2] (14th Ed. 1976). The Court in *Elliott* held that the bankrupt's written agreement was a valid trust agreement and rejected the argument that it established an invalid statutory lien. Id. at 751, 753.

Congress could have established a "lien" for the benefit of unpaid livestock sellers, but it did not choose to do so. Congress instead legislated a trust for the benefit of cash sellers, thereby evidencing an intent that the law of trusts, rather than the law of liens, should govern the rights inherent in the relationship between meatpackers and those who sell them livestock for cash. In view of this choice made by Congress, § 67(c)(1)(B), which is available to a bank-

ruptcy trustee only for the purpose of invalidating certain liens, does not empower him to invalidate the 7 U.S.C. § 196 trust.

If § 67(c)(1)(B) did empower the trustee to invalidate the trust, the primary purpose for which 7 U.S.C. § 196 was enacted by Congress would be completely frustrated as a result. Senate Report No. 94–932, which is part of the legislative history of 7 U.S.C. § 196 states:

"It is the Committee's belief that the trust provision offers producers the best protection against packer bankruptcies. They would now receive their money, the money they expected to receive when they sold their livestock, before secured creditors. This provision, together with the bill's provisions on packer prompt payment practices and packer bonding, should avoid the recurrence of the effects of the American Beef Packers bankruptcy." 1976 *U.S. Code Congressional & Administrative News*, 94th Cong., 2d Sess., at 2279.

In view of this manifest intent to give cash livestock producers superior rights in bankruptcy over secured creditors, it is inconceivable that Congress expected every bankruptcy trustee to be able, by virtue of § 67(c)(1)(B) of the Bankruptcy Act, to invalidate the trust fund and place livestock producers in a position subordinate to secured lenders. Congress does not legislate in a vacuum.

In fact, it is clear that Congress never intended § 67(c)(1)(B) to apply to federally mandated liens or trust relationships. Even if the 7 U.S.C. § 196 trust could be denominated a lien, it is apparent from the legislative history of § 67(c)(1)(B) that the liens which it was intended to invalidate are *state* statutory liens (and not federally created liens) that tended to disrupt the system of lien priorities imposed by the Bankruptcy Act:

"It will be recalled that one of the major objectives of the Chandler Act was to overcome the distortion of the Federal order of distribution by the creation of spurious statutory liens. To upset these liens which were in reality priorities, the

authors of the Chandler Act decided that if statutory liens on personal property, unaccompanied by possession, were postponed to wages and costs of administration, the most serious effects of these liens could be overcome. This provision was strengthened in 1952 when most liens of this nature were completely invalidated. However, a recent re-examination of *State* lien statutes has shown that neither the standard of possession nor the distinction between real and personal property is an entirely satisfactory criterion. Some liens which are genuine property rights are affected and others which were essentially *State*-created priorities escape. [Emphasis supplied]." H.R.Rep. No.686, 89th Cong., 1st Sess. (1965) (quoted at 4 Collier on Bankruptcy at 229–230).

Commenting on the foregoing quote, Collier states as follows:

"This provision is the heart of new § 67c. As in the case of dealing with § 60, or § 70c, or § 70e, where resort must be to *state* law to determine the effectiveness of a particular transfer against a particular group of persons in order to establish the trustee's rights, so too under § 67c, statutory liens are tested by their effectiveness against a particular group under *state* law. In this case, however, the group set up hypothetically is that known as bona fide purchasers. Whether or not any were or are in existence is immaterial. The matter for determination is whether *state* law requires any steps to be taken by the lienor to perfect his lien as against bona fide purchasers and whether or not such steps were taken prior to the filing of the petition in bankruptcy. If such steps were not taken before the date of bankruptcy, § 67c(1)(B) permits perfection after bankruptcy, as did former § 67b, but to avail himself of this privilege, the lienor must have at least perfected the lien so it would have been good against a judicial lien creditor prior to bankruptcy. This is the effect of the language in § 67c(1)(B) referring to § 70c and the trustee's status thereunder. By virtue of these two provisos in subdivision c(1)(B), perfection may be accomplished after bankruptcy only if there is still time permitted by *state* law to do so and, if perfection requires seizure of the property, notice filing with the bankruptcy will act as a substitute. Consequently, a statutory lien either will be valid or invalid under this subdivision. If valid, it will not be subordinated, except for tax liens which will be discussed shortly. If invalid, it will fall before the attack of the trustee who may, under § 67c(2), preserve the lien for the benefit of the estate." 4A, Collier on Bankruptcy, ¶ 67.-20[3.1] at 230.

See also, Comment to § 67(c) of the Bankruptcy Act, 1976 Collier Pamphlet Edition, Bankruptcy Act and Rules, Part I, 203–212 (quoting from House and Senate Reports on the 1952 and 1966 amendments to § 67(c)(1)(B)).

In the case at bar a statutory trust was established under 7 U.S.C. § 196(b). The funds derived from the liquidation of inventories and collection of receivables purchased by Frosty Morn in cash sales constitute a trust for the benefit of the unpaid cash sellers. The funds are not part of the bankrupt's estate. § 196 is not subject to invalidation by the trustee under § 67(c)(1)(B) of the Bankruptcy Act.

*Identifying and Tracing the Alleged Trust Property*

The trustee asserts that the burden rests on persons claiming the benefits of the trust created by 7 U.S.C. § 196(b) to identify the alleged trust fund or property and, where the fund has been commingled, to trace the property. The trustee cites the general rule in bankruptcy set forth in 4A, Collier on Bankruptcy, § 70.25 at 354–6, and insists that § 196(b) does not purport to override existing bankruptcy law with respect to a packer in bankruptcy; that § 196(b) does not expressly excuse the duty to identify and trace trust property; and that the legislative history of § 196(b) does not evidence an intent to excuse the duty to identify and trace.

Claimants insist that specific segregation, tracing, or identification of specific trust

assets is not required by § 196(b); that to construe the trust provisions of the Act to require specific identification, tracing, or segregation of trust assets, in the manner suggested by the trustee, will limit or nullify the effectiveness of the trust provisions. "Construing the trust provisions of the Act in a manner that doesn't require specific tracing is, we believe, consistent with the intent of Congress and is the only interpretation of the Act which will make the statute workable." Brief, U.S. Department of Agriculture, p. 2.

In July 1975 Frosty Morn entered into a financing arrangement with Citibank, N.A. and as security granted Citibank a first-lien security interest in inventory, accounts receivable, and the proceeds thereof. Citibank was also granted second-lien deeds of trust on real property owned by Frosty Morn to secure this indebtedness. The term lenders held second-lien security interests in the inventory, accounts receivable, and proceeds thereof, and first-lien deeds of trust on the real property. On November 4, 1977, when Frosty Morn filed a Chapter XI petition, the principal balance owing to Citibank was $4,192,189.38, plus $398.56 representing returned checks, which sum had previously been credited to Frosty Morn's account. After the filing of the Chapter XI petition Citibank continued to receive various funds of Frosty Morn, including the daily collection of accounts receivable and proceeds from the sale of inventory. The total funds received by Citibank after November 4, 1977, was $7,711,014.47. On November 21, 1977, the amount of the funds collected and held by Citibank for the first time exceeded the principal indebtedness under the financing arrangement.

On November 10, 1977, shortly after the Chapter XI petition had been filed, the debtor as debtor-in-possession was authorized to borrow from Citibank the sum of $650,000.00 and to issue a certificate of indebtedness therefor. On January 26, 1978, Citibank was authorized and directed to apply the sum of $650,000.00 from its postpetition collections from Frosty Morn to the principal balance due under the certificate.

On March 10, 1978, by Order No. 75 Bankruptcy Judge Kinnard approved a Stipulation of Settlement between Citibank and the receiver wherein, *inter alia*, Citibank returned to the receiver funds totaling approximately $2,671,193.00 and waived its claim against receivables already in the hands of the receiver in excess of $300,-000.00. As heretofore indicated, paragraph 8 of that order directed the receiver to establish an escrow of $2,743,122.00 to protect the rights of potential beneficiaries of the statutory trust under 7 U.S.C. § 196.

From these recitations, it clearly appears that approximately $8,000,000.00 was derived from the liquidation of inventory and receivables of Frosty Morn after the filing of the Chapter XI petition on November 4, 1977. The net realization, of course, would be somewhat less as the $650,000.00 advance by Citibank after the Chapter XI petition was filed was for the purpose of enabling Frosty Morn to continue its operations in processing and liquidating the inventory and collecting the receivables.

If tracing or identification of specific trust assets is not required, it is obvious that sufficient funds have been escrowed to pay unpaid cash sellers in full as soon as the amounts of their claims are determined. If tracing or identification is required, further proof may be necessary.

Claimants and the Department of Agriculture strongly urge that—

"The language of the Act together with the extensive legislative comments indicate that the trust was meant to be a constructive statutory trust arising by operation of law. The trust was designed to be a floating trust which would automatically attach to 'all of the livestock, inventories, receivables and proceeds therefrom held by a packer to the extent of the amount owed the unpaid cash sellers' Congressional Record, June 17, 1976, page S9694. Specific identification or segregation of the trust assets was not contemplated nor required. It was intended that the Packers and Stockyards Administration, upon the occurrence of an incident which would trigger the trust,

audit the books and records of a packer to determine the amount of unpaid cash sellers. The trust would attach to the commingled livestock inventories, and receivables or proceeds derived from livestock up to the amount owed to the unpaid cash sellers. If specific identification or segregation of the trust assets were required, the provisions of the statute, in the view of the administration, would be administratively unworkable since the Packers and Stockyards Administration cannot readily determine, from the books and records of a packer, which of the commingled assets were derived from cash transactions and which were derived from credit transactions. The provisions of a statute should be construed to make its various parts administratively workable. *NLRB v. John S. Barnes Corp.*, 178 F.2d 156 (C.A.7 1950); *NLRB v. Greensboro Coca Cola Bottling Co.*, 180 F.2d 840 (C.A.4 1950). If specific identification and segregation of trust assets is required burdensome amounts of paperwork on the part of packers would be necessary to make the legislation workable. Congress and the Packers and Stockyards Administration, from the discussions above, clearly rejected the concept of specific identification, segregation and tracing of trust assets and clearly intended the statute to operate effectively in a manner which wouldn't saddle packers with additional and burdensome recordkeeping requirements." Brief, Department of Agriculture.

An interpretation of the statute in accordance with the views expressed by the Department of Agriculture would certainly simplify and possibly expedite the resolution of the basic issue. After carefully considering the statute and the legislative history, however, I cannot accept at this time the premise that the 2.7 million dollars presently held in the escrow account was derived from livestock purchased by Frosty Morn in cash sales.

■ § 196(b) plainly states that "(A)ll livestock purchased by a packer in cash sales ..." (underscoring added) and all in-

ventories and receivables therefrom "... shall be held by such packer in trust for the benefit of all unpaid cash sellers...." "Cash sale" means a sale in which the seller does not expressly extend credit to the buyer. § 196(c). Thus, Congress clearly recognized that packers would be purchasing from both cash sellers and credit sellers. The livestock, proceeds, and receivables purchased from cash sellers would be held by the packer in trust for the unpaid cash sellers. The livestock, proceeds, and receivables purchased from credit sellers would become a part of the general assets of the packer and would be subject to the claims of other creditors—security interests, wages, taxes, trade creditors, et cetera. Congress could not but have been aware that packers would have debts other than those incurred from cash purchases. Had Congress intended to establish a trust on *all* purchases by a packer for the benefit of unpaid cash sellers, it could easily have done so by eliminating the words "in cash sales" from the first sentence of the statute.

The legislative history of the statute supports this interpretation.

The Report of the House Committee on Agriculture states:

"No specific identification of the livestock from which carcasses, meats, proceeds or receivables is required. Instead, they are held in a pool in trust for the benefit of all unpaid cash sellers." H.R.Rep.No.94–1043, 94th Congress, 2d Sess., April 14, 1976, page 7.

Similar language is contained in the Senate Committee on Agriculture and Forestry Report. Senate Report No. 94–932, 94th Congress, 2d Sess., June 4, 1976, page 13, U.S.Code Cong. & Admin.News, 1976, p. 2267. On the floor of the House, Congressman Bergland, now Secretary of Agriculture, recited the trust provision which was subsequently enacted and asked whether "it [was] intended that any ongoing segregation of funds or custodial account would be required by this provision." Congressman Thone, one of the chief proponents of the legislation, replied "No," that there would be no need for any special segregation of

current assets since under the bill the trust attached on such livestock, inventories, and receivables until full payment had been received by the unpaid sellers and there would be no necessity for determination of that trust *except in situations such as bankruptcy where the interests of the various claimants must be specifically determined*; further, that the amount of the trust could be determined from the packer's records at any time by "just a simple audit."

The reference to the interests of "various claimants" could have referred only to the interests of the cash sellers, the credit sellers, and other creditors of the bankrupt.

Later Congressman Thone noted that under § 1 of the Stockyards Act each packer was required to keep such memoranda as correctly discloses all transactions involved in his business; that insofar as the stockyards administration was aware, every packer kept records from which accounts receivable and proceeds and amounts due each unpaid seller could be determined from an audit of those books and records. "*Upon bankruptcy, for example, an audit would reveal the amount in the commingled accounts due to the packer and thus to the extent of the application of this trust that would take care of it.*" (Emphasis added) Cong.Rec. May 6, 1976, page H4010.

Thereafter Congressman Latta referred to the first sentence of the trust provisions of the Act and asked whether "all livestock purchased" would include livestock that may have been paid for by the packer. Congressman Thone replied:

"We are talking about 'all' in the context of what has *not* been paid for." (Emphasis added).

Congressman Thone then goes on to state that, as a practical matter, what will occur is that a "floating trust" will exist to insure that unpaid livestock cash sellers are ultimately paid; that it need not and should not prevent a packer from obtaining a loan on his livestock, meat products and accounts receivable "for normally the amount of unpaid cash sellers outstanding at any one time should not be very great." Pages H4010–11.

Thus, in enacting § 196(b) Congress was aware (1) that commingling of livestock, inventory, and receivables would occur; (2) that in the event of bankruptcy an audit would be necessary to "determine the interests of various claimants"; (3) that it would be necessary to identify the livestock, accounts receivable, and proceeds from the meat that would be subject to the trust for the "unpaid cash sellers of the livestock." (This was considered "no problem" since under the P & S Act all packers were required to keep such records as would fully and correctly disclose all transactions involved in their businesses.)

Also included in the Congressional Record in both the House and the Senate are a series of questions by Congressman Thone and Senator Clark respectively and the answers of Marvin McLain, then Administrator of the Packers and Stockyards Administration, explaining the intent of the trust and how it was to operate. Set forth immediately below are the relevant portions of those questions and answers.

1. Section 8 of the bill impresses a trust on all "livestock purchased by a packer in cash sales and all inventories of or receivables or proceeds from meat, meat food products, or livestock derived therefrom" for the benefit of all unpaid cash sellers until full payment has been made. It was not intended by the Committee that by on-going segregation of funds (custodial account) would be required by this provision. Do you see any necessity for segregation of such current assets?

*Answer:* No. There would be no need for any special segregation of such current assets, since under the bill the trust attaches on such livestock, inventories, receivables and proceeds to the extent of the amount owed the unpaid cash sellers and there would be no necessity for a determination of the amount of that trust except in situations, such as bankruptcy, where the interests of various claimants must be specifically determined. The amount of the trust could be determined from the packer's records at any time by an audit. Although the livestock, inventories, receivables and proceeds derived from the livestock purchased

by the packer in cash sales would be commingled with all other assets in the normal operations of the business, such an audit would reveal the extent of the interest of the unpaid cash sellers in such commingled assets and therefore subject to the trust.

2. The Committee did not intend that the trust provisions, section 8, extend to the meats or meat food products purchased (and held) by retailers from the packer in good faith transactions; but rather, that the trust would attach to the accounts receivable, cash (or equivalent) or proceeds received by the packer in payment for such products. For purposes of conveying the practical effects of such a procedure to the Membership on the Floor, could you explain how this would work and whether or not you believe this would work a hardship on the packers or the retail purchasers?

*Answer:* The Committee Report 94–1043 states at page 7 that: "The trust does not extend to livestock, meats, etc., which have been purchased from the packer in good faith transactions." Upon the purchase of a retailer in the ordinary course of his business, the packer would then have an account receivable from the retailer for the purchase price of the product and that account receivable would be subject to the trust. When the retailer pays the purchase price, the trust would then attach to that payment. In the event of bankruptcy of the packer after the purchase in the ordinary course of business and prior to payment by the retailer to the packer, the relationship of the retailer and the packer would not change in any respect by virtue of the trust. The retailer would still owe the packer the purchase price of the product and when he pays for the product, the payment would be subject to the trust to the extent of the amount owed to the unpaid cash seller of the livestock. The packer or the livestock seller would not be adversely affected by the fact that the trust would be applicable only with respect to the meat, meat food products, and livestock products in the possession of the packer, and then to the packer's account receivable for the sale of the products, and then to the proceeds paid by the retailer to the packer to satisfy the account receivable.

3. The Committee intended that the trust established by section 8 be a constructive statutory trust arising by operation of law and that it need not specifically identify the livestock, accounts receivable, meat or meat products to which it attaches until the event (insolvency or bankruptcy) occurs which, as a result of its occurrence (marshalling of assets, etc.), results in the identification of certain assets to which it has attached.

As a practical matter, based on the experience of the Packers and Stockyards Administration, should such identification of assets to which the trust would attach in the event of bankruptcy, cause any difficulty in the administration of this program as outlined above?

*Answer:* No. There should be no problem encountered in identifying the livestock, accounts receivable, and proceeds from the meat, meat food products, or livestock products subject to the trust for the unpaid cash sellers of the livestock. Under section 401 of the Packers and Stockyards Act, every packer is required to keep such accounts, records and memoranda as fully and correctly disclose all transactions involved in his business. Insofar as we are aware, every packer keeps books and records from which the amount of the inventories, receivables and proceeds and the amount owed to each unpaid cash seller of the livestock to the packer can be determined by an audit of those books and records. Upon bankruptcy, for example, an audit would reveal the amount of the commingled inventories, accounts receivable and proceeds, the amount owed ... (to) the unpaid cash sellers of livestock to the packer, and thus the extent of the application of the trust. The audit would reveal the amount which must be paid to the unpaid cash sellers before the commingled inventories, accounts receivable, and proceeds are freed from the trust. Accordingly, we foresee no problem in the administration of this program as contemplated by the Committee.

4. The Committee intended that existing secured credit transactions entered into be-

 tween packers and their banks or other financing agents become subject to the trust provisions of this bill upon the date of enactment. Could the Packers and Stockyards Administration generally give publicity to the prospective enactment of this legislation so that packers would be on notice of its provisions? Further, do you believe such an effective date provision would work a hardship on the industry?

*Answer:* Yes. The Packers and Stockyards Administration would be glad to cooperate with the Committee in advising affected packers of action by the Congress with respect to this provision. It is our understanding that the various packer associations have been keeping currently abreast of developments in connection with the bill and they are no doubt keeping their membership currently advised. Also, various financial organizations have been following the developments in connection with the trust provisions. Accordingly, we would anticipate that all affected packers will receive timely notice of action by the Congress with respect to the trust provisions and we would not anticipate any hardship on the industry in this regard.

5. Based on your experience with packers and their credit arrangements, need a "floating lien creditor" arrangement between a packer and his banker or other financing entity be in any way adversely affected by a trust provision such as that contained in section 8? Explain.

*Answer:* The Section 8 trust provision would have an effect upon the credit arrangements between a packer and his banker or other financial entity since the lender would no longer have the livestock of the unpaid cash sellers and the products therefrom available as a source of additional security for his loan to the packer, until the livestock sellers have been paid. However, we would not anticipate that this result will have any adverse long term impact upon the credit arrangements of the packing industry. Congressional Record, Senate, June 17, 1976, page S9695. See also material at Congressional Record, June 17, 1976, pages S9694–95, Congressional Record, May 6, 1976, pages H4008–10. Brief, Department of Agriculture.

After reviewing the legislative history it becomes clear why Congress limited the trust to "livestock purchased by a packer in cash sales" and the inventories and products derived therefrom. I, therefore, cannot read those words out of the Act. If the statute as enacted does not meet the problem it was designed to correct, Congress should make the necessary change, not this Court. I am fully aware of the problems alluded to by the Department of Agriculture involving an audit to determine the amount in the escrow account that is subject to the trust, but I must construe the provisions of the statute as enacted by the Congress. Specific identification by each seller or tracing of his livestock into inventory and receivables is, of course, not required (the legislative history makes this clear) and, as will be seen hereafter, under the facts of the instant case, the burden of showing that the escrow in this proceeding of 2.7 million dollars, plus the additional $300,000.00 receivables collected by the receiver, is *not* subject to the trust will be placed on the trustee.

The escrow of 2.7 million dollars and the $300,000.00 is money derived from the approximately eight million dollars worth of accounts receivable which have been collected by Frosty Morn, or its collection agent, Citibank NA, or Mr. Deutscher, the receiver/trustee. Prior to the appointment of Mr. Deutscher as receiver on December 21, 1977, Frosty Morn retained possession of its books and records. Since his appointment Mr. Deutscher has been in possession of those records. Apparently neither the debtor nor the receiver/trustee has caused an audit to be made to determine what part of the livestock, inventory, proceeds, and receivables of Frosty Morn on November 4, 1977, was subject to the trust imposed by the Congress in § 196. An audit would, of course, have disclosed "the extent of the interest of the unpaid cash sellers in (the) commingled assets and therefore subject to the trust." If an audit has not been made, the trustee will be directed forthwith to

cause one to be made and filed with the court. The costs and expenses of the audit will be borne by the trustee, not claimants. If, due to inadequate record keeping, loss of documents, lapse of time, commingling, or for any other reason, the trustee is unable to cause an audit to be made that will determine the amount subject to the trust, or if such audit does not clearly indicate the amount subject to, and not subject to, the trust, the trustee will have failed to carry the burden imposed upon him and the unpaid cash sellers, as determined by this Court, will be paid from the escrowed funds. In other words, the burden will be upon the trustee to segregate out of that mass what he apparently contends is part of the assets of the bankruptcy estate, and not funds subject to the trust.[5]

I have not the slightest hesitancy in imposing this burden of proof upon the trustee. The P & S Act is remedial legislation which should be construed liberally so as to effectuate the purpose of Congress. It cannot be overlooked that the receiver/trustee has had full and complete charge of Frosty Morn's assets and records for some nine months. The escrow account was established more than five months ago. By order dated January 9, 1978, Bankruptcy Judge Kinnard directed trust fund claimants to file their claims with the court. The trustee filed no objections to any claim until I entered an order on August 1, 1978, directing that objections to claims be filed on or before August 11, 1978.

I am fully aware that since his appointment the receiver/trustee has been actively engaged in liquidating the assets belonging to the estate. I am equally aware that it was the intent and purpose of the Congress in enacting § 196(b) that priority be given to enforcing the rights of unpaid cash sellers of livestock. The reasons are clear and fully set forth in the legislative history. In this case although some ten months have elapsed since Frosty Morn filed its Chapter XI petition leaving a large number of unpaid cash sellers, they have received nothing from the bankruptcy estate.[6] For this reason, the trustee must move expeditiously in obtaining an audit. An order will be entered fixing the date within which the audit must be completed.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.

## ORDER

In accordance with the Memorandum filed this date containing findings of fact and conclusions of law, Bankruptcy Rule 752; it is

ORDERED, ADJUDGED, AND DECREED

(1) That Pub.L. 94–410 is within the Congressional power and valid;

(2) That Pub.L. 94–410 is not subject to invalidation by the trustee under § 67(c)(1)(B) of the Bankruptcy Act;

(3) That the trustee, within the time fixed by separate order of this Court, cause on audit of the records of Frosty Morn Meats, Inc. to be made for the purpose of determining within reasonable certainty the value of the livestock, inventory, proceeds, and receivables of Frosty Morn Meats, Inc. on November 4, 1977, subject to the trust imposed by 7 U.S.C. § 196;

(4) That upon the failure of the trustee to cause such audit to be made, or upon his failure to establish within reasonable certainty the value of the livestock, inventory, proceeds, and receivables on November 4, 1977, subject to the trust, the escrowed account of $2,743,122.00, plus the $300,000.00 receivables in the hands of the trustee, shall be deemed subject to the trust imposed by 7 U.S.C. § 196 for the benefit of the unpaid cash sellers of Frosty Morn Meats, Inc.

---

5. Neither Frosty Morn, nor its successor in interest, the receiver/trustee, can be permitted to defeat the specific purpose of 7 U.S.C. § 196 by asserting some ten months later that the property subject to the trust cannot be ascertained because of "commingling" or because an audit was not made. Congress clearly indicated that, in the event of bankruptcy, an audit should be made.

6. Citibank NA has, of course, received in excess of $4,000,000.00 as a secured creditor.

## APPENDIX B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION
Filed Sept. 14, 1978

In re

Bankruptcy No. BK 77–31707

FROSTY MORN MEATS, INC.
Bankrupt

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

### I

On August 31, 1978, this Court entered Memorandum Opinion containing findings of fact and conclusions of law—(1) that Pub.L. 94–410 was within the Congressional power and valid and (2) that Pub.L. 94–410 was not subject to invalidation by the trustee in bankruptcy under § 67c(1)(B) of the Bankruptcy Act.[1] The Memorandum and Orders entered pursuant thereto directed the trustee within thirty (30) days to cause an audit of the records of Frosty Morn Meats, Inc., to be made for the purpose of determining within reasonable certainty the value of the livestock, inventory, proceeds, and receivables on November 4, 1977, that were subject to the trust imposed by 7 U.S.C. § 196.[2]

A hearing on other objections filed by the trustee to the trust fund claims was held August 31–September 1, 1978, at which time the testimony of more than two hundred claimants was adduced and several hundred exhibits introduced. This Memo-

randum will relate to grounds nos. 8 and 11 of the trustee's objections and specifically to the trustee's assertion that the signing of so-called "weight bills" by sellers and others constituted an extension of credit or a waiver and, therefore, an exclusion from the benefits of the statutory trust established by the Act, 7 U.S.C. § 196(b).[3] The findings and conclusions in the Memorandum of August 31, 1978, are equally applicable to trustee's objections nos. 8 and 11, considered in this Memorandum, and for such purpose are incorporated herein.[4]

The trustee's eighth ground for objecting to allowance of trust fund claims is:

The claimant waived by written instrument or otherwise all rights in, under and to the trust created by 7 U.S.C. § 196.

The trustee's eleventh ground for objecting is:

The transaction wherein the claimant transferred or delivered livestock to Frosty Morn Meats, Inc. was not a "cash sale" as said term is defined in 7 U.S.C. § 196, as amended, and the regulations thereunder, which fact is evidenced by each of the following (ONLY CHECKED ITEMS APPLY):

☐ a. Claimant accepted a draft or other comparable payment instrument in payment for such livestock;

☐ b. Claimant executed a written instrument extending credit relative to the purchase and sale of such livestock;

☐ c. Other.

The pertinent part of the instrument, the weight bill, relied upon by the trustee as a credit extension agreement or as a waiver of the benefits of the trust, reads as follows:

#### SALE OF LIVESTOCK ON CREDIT

The undersigned hereby agrees to sell to you on credit terms and prices the number of head, kind

---

1. Trustee's objections nos. 1 and 3, filed August 11, 1978, to the claims of "trust fund" claimants.

2. This finding and order related to trustee's objection no. 2.

3. See weight bill, Appendix "B1", attached hereto.

4. As indicated in the Memorandum of August 31, 1978, more than ten months has elapsed since Frosty Morn sought relief under the Bankruptcy Act (November 4, 1977). Although secured lenders have been paid more than four million dollars, unpaid "cash sellers" relying upon 7 U.S.C. § 196, have received nothing; hence, the urgency of the matter before the Court.

and weight as listed below or, sell to you from time to time livestock described on individual purchase orders, other written documents, or described and priced as indicated below:

Terms of Credit will be as follows: (check one)

( ) a. By check at time of delivery, the terms of the credit extending until check is paid.

( ) b. By check in mail afternoon of delivery, the terms being until check is paid.

( ) c. Within one (1) week from date of delivery.

( ) d. Other (explain when) ——————————

Seller recognizes that, by agreeing to the sale of livestock on credit, no trust, whether implied, statutory or otherwise, will attach to the livestock sold, or the by-products or proceeds herefrom. This credit agreement on more than one transaction shall continue until revoked by us upon ten (10) days written notice, effective ten (10) days from date said notice is received by you.

It is further agreed that, on the same date notice is mailed to you, a copy of the written notice of termination will be mailed to specified lender whose name and address is as follows: Citibank, N. A., P. O. Box 5138, New York, N. Y. 10017 —————

SELLER ————————————

Accepted this ——————— day of ——————— FROSTY MORN MEATS, INC. BY: ——————————— Duly Authorized Signature

## II

The trust provision (§ 206 of the Act, 7 U.S.C. § 196) provides in part:

"(b) All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers. . . ."

"(c) For the purpose of this section, a cash sale means a sale in which the seller does not expressly extend credit to the buyer."

The prompt payment provisions of the Packers and Stockyards Act found in 7 U.S.C. § 228b are also pertinent. The requirements of § 228b are consistent with the congressional intent and the custom in the livestock industry that purchases of livestock are on a cash basis, unless otherwise expressly agreed. § 228b provides:

(a) . . . each packer . . . purchasing livestock for slaughter shall, before the close of the next business day following purchase of livestock and transfer of possession thereof, actually deliver at the point of transfer of possession to the seller or his duly authorized representative a check or shall wire transfer funds to the seller's account for the full amount of the purchase price; or, in the case of a purchase on a carcass or "grade and yield" basis, the purchaser shall make payment by check at the point of transfer of possession or shall wire transfer funds to the seller's account for the full amount of the purchase price not later than the close of the first business day following determination of the purchase price: *Provided further*, that if the seller or his duly authorized representative is not present to receive payment at the point of transfer of possession, as herein provided, the packer . . . shall wire transfer funds or place a check in the United States mail for the full amount of the purchase price, properly addressed to the seller, within the time limits specified in this subsection, such action being deemed compliance with the requirement for prompt payment.

(b) Notwithstanding the provisions of subsection (a) of this section and subject to such terms and conditions as the Secretary may prescribe, the parties to the purchase and sale of livestock may expressly agree in writing, before such purchase or sale, to effect payment in a manner other than that required in subsection (a) of this section. Any such agreement shall be disclosed in the records of any market agency or dealer selling the livestock, and in the purchaser's records and on the accounts or other documents issued by the purchaser relating to the transaction.

The prompt payment provisions of § 228b require that a packer make payment for livestock before the close of the next business day following the purchase of livestock

and the transfer of possession thereof by actually delivering a check at the point of transfer of possession or by wire transfer of funds to the sellers account or, in the case of a grade and yield transaction,[5] that payment be made by check or wire transfer of funds to the seller's account "not later than the close of the first business day following determination of the purchase price...." 7 U.S.C. § 228b. The expectation of payment within the time called for by § 228b means the transaction is a cash sale. If a livestock seller expressly agrees in writing before the sale of the livestock that payment may be made beyond the time called for in § 228b, i. e., before the close of the next business day following purchase of the livestock and transfer of possession thereof in a live weight transaction, or not later than the close of the first business day following determination of the purchase price in a "grade and yield" transaction, the transaction would become a credit transaction. In a credit transaction the seller has no interest in the trust because the sale of his livestock was not on a cash basis as required under 7 U.S.C. § 196. § 228b requires a packer to deliver a check at the point of transfer of possession but only before the close of the next business day. In most cases, the seller will not want to remain at the point of transfer of possession until the close of the next business day. A packer and seller, therefore, may prefer that the packer mail a check before the close of the next business day rather than have it delivered at the point of transfer of possession. In such a case or for other legitimate reasons a seller may agree in writing to allow the packer to mail his check before the close of the next business day after the transaction. By agreeing to do so, a seller does not waive his interest in

the trust since he has agreed only to accept payment by check in a different manner than required by § 228b(a), but still within the time period in which a cash sale occurs. In such a situation the seller is a cash seller and does not lose his interest in the trust.

Nothing in Section 7 [prompt payment provisions, section 409 of the Act, 7 U.S.C. 228b] would preclude a packer and a producer from agreeing in writing that the packer may transmit through the mails, by the close of the next business day, payment for livestock purchased. Such action would not result in the producer being considered a credit seller. If, however, the agreement is for payment beyond the close of the next business day, the producer would be considered a credit seller and as such would forfeit his rights under the trust. Senate Rep. No. 94–932, Committee on Agriculture and Forestry, June 4, 1976, page 12.

§ 192 of the Packers and Stockyards Act in pertinent part reads as follows:

*Unlawful practices enumerated.*—It shall be unlawful with respect to livestock, meats, meat food products, livestock products in unmanufactured form, poultry, or poultry products for any packer or any live poultry dealer or handler to:

(a) Engage in or use any unfair, unjustly discriminatory, *or deceptive practice or device* (emphasis added); ....

§ 193 provides certain procedures to be taken before the Secretary for violations of § 192—complaints, hearings, reports and orders, et cetera, and § 195 provides for punishment for violation of an order of the Secretary issued pursuant to § 192.

### III

The "weight bills" cannot be considered as valid credit extension agreements. The

---

**5.** A grade and yield transaction is a transaction in which livestock are delivered to the packing plant, slaughtered, and the following day inspected by a USDA inspector who designates, carcass by carcass, quality and yield designations e. g. grade, choice, yield 2. In a regular, or live weight transaction, as opposed to a grade and yield transaction livestock are purchased on the basis of live weight. The livestock are weighed when they arrive at the packing plant or the packer's buying station

and the purchase price is determined immediately upon the basis of the live weight of the livestock and a visual determination of the quality of the carcass. In a grade and weight transaction the purchase price is not determined until after the livestock has been slaughtered and the USDA inspector has determined the grade and yield of the carcass. This latter determination is usually made one to two days after the price determination would be made in a live weight transaction.

trustee's assertion that those claimants, or persons allegedly acting on their behalf, who signed the weight bills, waived rights in, under, and to the trust credited by 7 U.S.C. § 196, is rejected. The sellers will for all purposes be deemed cash sellers under 7 U.S.C. § 196.

During the two years prior to bankruptcy, Frosty Morn obtained a substantial amount of operating capital under a loan agreement with Citibank, N.A. The proof is clear that for many months prior to its financial collapse Frosty Morn was using various and sundry means of converting "cash sales" into "credit sales." Citibank was obviously concerned about the impact that the enactment of Pub.L. 94–410 (7 U.S.C. § 196) would have on its security position. In the event of bankruptcy, all livestock purchased from Frosty Morn "in cash sales" and all inventory and receivables derived therefrom would constitute a "trust" for the benefit of unpaid cash sellers. See § 196(b). Livestock, inventory, and receivables purchased in credit sales would fall under Citibank's security interest. The record discloses that Citibank demanded a ratio of 80% credit sales to 20% cash sales. In attempting to carry out Citibank's directive, Frosty Morn set out on a planned course to convert cash sales into credit sales, thus complying with Citibank's directive and forestalling Citibank from curtailing or withholding entirely advances necessary to Frosty Morn's continued operations.

In an attempt to bypass the impact of the statutory trust, documents referred to as "blanket agreements" and "weight bills" were developed by Frosty Morn at the request of Citibank, N.A., to provide a working agreement which purportedly would meet the requirements of the Packers and Stockyards Act. During the period the loan was in effect, Frosty Morn devised three (3) different formats for a "blanket agreement." The reason for this was that Citibank N.A. was of the opinion that the first

two "blanket agreements" did not meet the requirements of the Act and would not be valid credit agreements. It is inconceivable, however, that officers of Frosty Morn and Citibank N.A. regarded the "weight bills" and the manner in which they were being obtained as valid extensions of credit.

With respect to the "weight bills" and blanket waivers, the trustee stands in the shoes of Frosty Morn, the bankrupt, subject to all valid claims and equities enforceable against a bankrupt. An exception, of course, would be in cases where there had been a conveyance or encumbrance void or voidable as to the trustee by some positive provision of the Bankruptcy Act. See *In re Toms*, 101 F.2d 617, 619 (6th Cir. 1939). This is not the case here, however.

### IV

The use of weight bills was only one device used by Frosty Morn in an attempt to convert "cash sales" into "credit sales." Livestock sellers would deliver livestock to Frosty Morn which would be weighed and a weight bill prepared. While the cattle were being moved from the scales to the slaughter area, the sellers, or the persons actually delivering the livestock, would be asked to sign a weight bill. Many were not signed at all but a large number were signed. A substantial number were signed by truckers or haulers or other persons without authority from the sellers to extend credit on their behalf. Some who signed did so after its purpose or intent (an extension of credit or a waiver, according to the trustee) was misrepresented by Frosty Morn's employees— those who weighed the cattle. Some sellers were told it was merely a verification of cattle weights; others that it was a requirement of the Packers and Stockyards Act; still others that it was necessary in order to get their checks, even though in most instances the checks were delivered simultaneously with the signing of the weight bills.[6] An exception, of course, to immedi-

---

**6.** In order to obtain the benefits of a "float" of several hundred thousands of dollars, sellers at Frosty Morn's Clarksville, Tennessee plant were issued checks drawn on a Kinston, North Carolina, bank, and sellers at its Kinston plant were issued checks on a Clarksville bank. Apparently on November 4, 1977, when the Chap-

ate payment would be "grade and yield" sales where the purchase price could not be determined at the time of the sales. A few signed the weight bills mistakenly believing that they were signing statements that they had not fed their cattle the drug Diethylstibestrol, since such statements had been required at one time, and Frosty Morn had placed the new "waiver" language at the same place on the weight bills that the old DES statements had been formerly.

Some representations made by Frosty Morn's employees—at the direction of their superiors—if not actually fraudulent, were certainly designed to misrepresent the purpose for which the weight bills were to be used. At the very least there was a failure to disclose the true purpose for soliciting and obtaining the seller's signatures to the documents. Many of the sellers were local farmers who had for many years taken their livestock to Frosty Morn because they had not only learned to trust and respect the professional manner in which they were treated, but also because Frosty Morn provided the only accessible market available.

The "terms of credit" shown on the weight bills fall into four categories:

( ) a. By check at time of delivery, the terms of the credit extending until check is paid.
( ) b. By check in mail afternoon of delivery, the terms being until check is paid.
( ) c. Within one (1) week from date of delivery.
( ) d. Other (explain when) _____

In addition, of course, is the exceedingly fine print (same size as above) immediately below the four categories stating the seller "recognizes that, by agreeing to the sale of the livestock on credit, no trust ... will attach to the livestock sold, or the by-products or proceeds therefrom."

The trustee introduced into evidence some 25 weight bills with "a" checked, none with "b" checked, one with "c" checked, 76 with "d" checked, one with both "a" and "b" checked, and 70 with neither "a", "b", "c", nor "d" checked. There appears to

have been no rhyme or reason as to the use of the various categories. The cattle weighers were apparently told by their superiors to obtain the sellers' signatures to the weight bills and to check one of the boxes but in 70 instances they failed to do so.[7]

I place absolutely no reliance on the weight bills as extensions of credit or waivers of trust fund rights. Their use was conceived with only one purpose in mind—to convert legitimate cash sales into credit sales—a false, misleading, and utterly indefensible scheme. Regardless of how these sales are shown in the books and records of Frosty Morn, they will be considered cash sales for the purpose of 7 U.S.C. § 196. Frosty Morn's deception cannot be used to defeat the claims of trust fund claimants.

Under "Terms of Credit" many of the weight bills are checked "a. By check at time of delivery, the terms of the credit extending until check is paid" or "b. By check in mail afternoon of delivery, the terms being until check is paid." Even by agreeing to allow Frosty Morn to mail his check before the close of the next business day (Item b), the seller did not waive his interest in the trust since he agreed only to accept payment by check in a different manner than required by the Act, but within the time period in which a cash sale occurs.

Item a is no extension of credit whatsoever, since a check was issued at "time of delivery."

The trustee apparently concedes that Frosty Morn violated regulations of the Packers and Stockyards Act in its scheme to convert cash sales to credit sales but insists that even though such violation may constitute an "unfair practice," it would not affect the validity of the express extensions of credit and waivers executed by Frosty Morn and many of the livestock sellers.[8] This is a specious argument and wholly

ter XI petition was filed, more than $2,000,-000.00 in checks were outstanding.

7. The trustee insists that even though no specific box is checked, the "waiver" is sufficient.

8. Supplemental brief of trustee filed August 30, 1978.

without substance in fact or in law. Misrepresentation and unfair practices are illegal and cannot be condoned in any guise or for any purpose.

The trustee further asserts that it is no defense that some of the sellers may have been mistaken as to what they had signed but that "(t)he language was conspicuous and clear." Even a cursory glance at the weight bills conclusively refutes this assertion. The language was neither conspicuous nor clear.

In view of the holding herein, it is unnecessary to consider 9 C.F.R. 201.200 and its effect on the purported trust waivers, as asserted in the brief filed by the United States Attorney. It is the position of the government that 9 C.F.R. 201.200 requires a packer to obtain written acknowledgements in the *exact language* specified in the regulations before he purchases livestock on credit; that these regulations are substantive regulations which were published after notice to the public on December 22, 1976 (Fed.Reg. Vol. 41 No. 247, pages 55828–33) of intent to promulgate them and after an opportunity to comment was afforded the public; and that as substantive regulations they have the force and effect of law. On and after their effective date, November 1, 1977, any credit agreement not executed in accord with the requirements of 9 C.F.R. 201.200 is null and void.[9]

### V

I find and conclude that obtaining signatures of sellers on weight bills was part of an invalid if not an actually illegal scheme on the part of Frosty Morn to convert "cash sales" into "credit sales" so as to assuage Citibank, N.A., the secured lender; that there was no meeting of the minds that the weight bills constituted credit extension agreements or waivers of trust fund rights; that by signing the weight bills claimants had no intention of extending credit to Frosty Morn or waiving their trust fund rights under 7 U.S.C. § 196; and that actual

9. Forty-four of the weight bills relied upon by the trustee were actually executed on November 1, 2, and 3, 1977.

misrepresentations were made in a large number of instances in order to obtain the sellers' signatures to the weight bills.

The sellers who signed weight bill tickets did not expressly agree in writing before the sale of the livestock to extend credit to Frosty Morn. Those transactions are not "credit sales" but "cash sales" within the purview of 7 U.S.C. § 196. Nor are the weight tickets valid waivers of the sellers' rights in the trust established by that statute. For all purposes set forth in this Court's Memorandum and Orders of August 31 and September 1, 1978, these sales will be treated by the auditors as cash sales.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.

### APPENDIX C

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

In re

Bankruptcy No. BK 77–31707

FROSTY MORN MEATS, INC.
Bankrupt

### MEMORANDUM AND ORDER

CLIVE W. BARE, Bankruptcy Judge.

This Memorandum will consider the trustee's objections to certain trust fund claimants that Pub.L. 94–410 protects "only persons who raise, feed or produce livestock" and not "regulated middlemen." The findings and conclusions made and entered in Memoranda filed August 31, 1978, and September 14, 1978, insofar as pertinent to a determination of the issue before the Court are incorporated herein and made a part hereof.

The pertinent statute reads in applicable part as follows:

*All livestock* purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash *sellers* of such livestock until full payment has been received by such unpaid *sellers*.... (Emphasis added). 7 U.S.C. § 196(b).

The statute is clear and unambiguous. The trustee's objections will be overruled.

Where the meaning of a statute is plain, it is the duty of the courts to enforce the statute according to its obvious terms. *Thornley v. United States*, 113 U.S. 310, 313, 5 S.Ct. 491, 493, 28 L.Ed. 999 (1885); *United States v. Turner*, 246 F.2d 228 (2d Cir. 1957).

In the livestock industry, livestock are sold by producers either directly to the packer or through middlemen. Such middlemen are regulated under the Packers and Stockyards Act (see 7 U.S.C. § 201 and § 213(a)) and such middlemen are either "market agencies" or "dealers" as those terms are defined in the Packers and Stockyards Act. 7 U.S.C. § 201(c) defines a market agency as "any person engaged in the business of (1) buying or selling in commerce livestock on a commission basis...." The term "dealer" is defined at 7 U.S.C. § 201(d) and means "any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser." In the trade certain firms operating as market agencies or dealers may never see the livestock which they buy or sell. For instance, if a feedlot in Iowa wants cattle for feeding purposes, a local dealer or market agency may be contacted by phone and requested to buy a certain type of livestock for the feedlot. This dealer or market agent may in turn contact a dealer or market agent in Texas who in turn contacts a local dealer who procures the cattle and ships them directly to the feedlot in Iowa. Each dealer or market agency in this chain is a buyer or seller of the livestock for purposes of the Act.

Whether a middleman takes title to the livestock, handles them for only 5 or 6 hours or does not even see them is immaterial.

Middlemen perform a necessary function in the marketing process and, with respect to slaughter livestock, oftentimes sell producers' livestock to packers. Without their efforts many producers would have fewer or no economically feasible markets for their livestock. Middlemen will not be able to continue functioning if the burden of packers' non-payment for livestock is shifted to them. Over the long run, the ability of middlemen to pay producers is directly dependent upon their ability to obtain payment from packers. The Congress recognized that the supply of meat for the American consumer is dependent upon a safe, reliable, and honest outlet for producers' livestock. In discussing the Amendments to the Packers and Stockyards Act on the floor of the House of Representatives, Congressman Hightower noted:

"this is not an anti-packer bill or pro-producer bill, it is a bill that we believe is carefully balanced, addressing the problem to provide for a good, safe market and a safe market is what will best serve the consumer." *Congressional Record*, May 6, 1976, p. H. 4011.

Congressman Hagedorn speaking in support of the bill noted that 230 million head of livestock with an aggregate value of 30 to 45 billion dollars are sold each year and that this legislation was designed "to establish basic ground rules which insure confidence among trading partners.... *Cong.Rec.* May 6, 1976, p. H. 4014.

In the Senate, Senator McGovern urged passage of the Amendments, including the trust provision, and noted that failure to pass the legislation would result in sanctioning "ruthless practices ... which will continue to endanger the legitimate efforts of farmers and livestock producers who seek only a safe, reliable, and honest marketplace for their products." *Cong.Rec.*, Senate, June 17, 1976, p. S. 9702.

Failing to accord the trust benefits to middlemen-sellers would only serve to provide a less safe and reliable market place for livestock producers. *Brief, United States Attorney, filed September 11, 1978.*

The trustee, in objecting to the trust claims of various middlemen, seeks to limit the meaning of the term "sellers" to owner-producers. However, it is clear from the definition of the term "dealers and market agencies," set forth above, that middlemen, regardless of whether they own the livestock, may buy and sell it. Thus, they are sellers. A seller is not necessarily an owner. In *Cady v. Murphy*, 113 F.2d 988 (1st Cir. 1940), cert. den., 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458, a statute imposing liability on any person who sells a security under certain circumstances, it was held at 990, that the statute

> imposes a liability for misrepresentations not only on principals, but also upon brokers when selling securities owned by other persons. This is not a strained interpretation of the statute, for a selling agent in common parlance would describe himself as a "person who sells" *though title passes from his principal, not from him.*" (emphasis added).

See *Katz v. Amos Treat & Co.*, 411 F.2d 1046 (2d Cir. 1969).

"A vendor is one who negotiates a sale and disposes of property for a consideration." *Canavan v. Coleman*, 216 N.W. 292, 293, 204 Iowa 901 (1927).

Black's Law Dictionary, Fourth Edition, defines "seller" as "one who sells anything; the party who transfers property in the contract of sale."

7 U.S.C. § 196(b) does not require that a "seller" be the "owner" of the livestock. To narrowly construe the term seller, as insisted by the trustee, would serve to defeat the remedial purposes of the Packers and Stockyards Act and would result in a narrow construction of a statute which is to be liberally construed.

The trustee insists that as the trust fund provision of the Packers and Stockyards Act has not yet been subject to court interpretation, the bond provision of the Act may properly be looked to for guidelines of Congress' protection intent. The trustee cites the decision of the Fifth Circuit in *Travelers Indemnity Co. v. Manley Cattle Co.*, 553 F.2d 943 (5th Cir. 1977). In that case, one Baker dba Baker Cattle Co. bought cattle from farmers for his own account. It was not disputed that those sellers had a right to the proportionate share of the protection of Baker's bond.[1] The appeal focused on whether the following events gave participation rights to another.

> Baker purchased cattle from other producers in separate transactions and paid their purchase price. He then sold these cattle to Equity Grazers, Inc. Contemporaneously with his sale to Equity, Baker entered into a contract with it under which he was to feed and treat these cattle until such time as Equity was ready to sell. Baker retained an option to purchase the cattle, this right was conditioned on Baker's agreement to place the cattle under a feeding agreement with Producers Grain Corporation. The agreement between Baker and Equity was also executed by Producers and was assigned to Producers at the time of execution. Producers guaranteed Equity's note at a bank which lent it the funds to make the purchase from Baker. When Equity resold the cattle to Baker, the purchase funds were loaned to Baker by Producers. Pursuant to Baker's contractual commitment, the cattle were placed in a feed lot operated by Producers. The cattle market declined during the course of these dealings, and although the cattle sold for more than the amount of the Equity purchase money which Producers advanced to Baker, they did not bring enough to repay this amount plus the cost of feed. Producers controlled the sale and applied the funds to payment of its feed bills before crediting any part against Baker's borrowing.

---

1. The specific statute on bond requirements is 7 U.S.C. § 204.

Baker became insolvent and Travelers Indemnity Company and the First National Bank of Hereford interpled the amounts of their respective obligations.

The Court noted that Baker's tricorn transactions with Equity and Producers involved the purchase of cattle from growers; a sale, feeding, and buy-back arrangement with Equity; and financing and final financing agreements by Producers and held "(T)hese are not the types of transactions intended to be secured by the bond required of registered dealers under the Packers and Stockyards Act and its implementing regulations."

This case in no way mandates a determination by this court that the term "sellers" in 7 U.S.C. § 196(b) is limited to farmers and ranchers and that middlemen are not entitled to the benefits of the trust.

The trustee's objections are overruled. The meaning of the term "sellers" in 7 U.S.C. § 196(b) is not limited to owner-producers. Middlemen are protected and are entitled to the benefits of the trust.

IT IS SO ORDERED.

## APPENDIX D

IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| IN RE: | ] | NOS. 78–3455–NA–CV |
|--------|---|---------------------|
| | ] | 78–3510–NA–CV |
| | ] | 78–3511–NA–CV |
| | ] | 78–3512–NA–CV |
| | ] | 78–3589–NA–CV |
| FROSTY MORN MEATS, INC., | ] | 78–3540–NA–CV |
| | ] | 78–3541–NA–CV |
| Bankrupt. | ] | 78–3542–NA–CV |
| | ] | 79–3003–NA–CV |
| | ] | 79–3016–NA–CV |
| | ] | 79–3019–NA–CV |
| | ] | 79–3105–NA–CV |
| | ] | 79–3123–NA–CV |
| | ] | 79–3124–NA–CV |
| | ] | 79–3125–NA–CV |
| | ] | 79–3183–NA–CV |
| | ] | 79–3184–NA–CV |
| | ] | 79–3198–NA–CV |
| | ] | 79–3199–NA–CV |
| | ] | 79–3298–NA–CV |
| | ] | 80–3303–NA–CV |
| | ] | 80–3304–NA–CV |

REPLY BRIEF ON BEHALF OF APPELLANT, IRWIN A. DEUTSCHER, TRUSTEE

PREFACE

MAY IT PLEASE THE COURT:

In an earlier conference relative to the captioned appeals counsel for the appellant advised the Court that the appellant would attempt to summarize the matters which he is pursuing in these appeals. That is the purpose of this Preface.

The Trustee has appealed from numerous orders of the Bankruptcy Court which overrule various objections of the Trustee to approximately 250 trust fund claims. Arguing the facts of each of 250 cases and each of the multiple issues in each case cannot be justified economically, particularly since many of the 250 claims are for amounts of only a few hundred dollars. Therefore, the Trustee hereby expressly withdraws his appeals as to all issues not briefed in his brief of July 7, 1980 or this brief. To list all of the issues hereby withdrawn would be time consuming and difficult. To point out the objections and claims that are appealed is easier and more direct.

Every "trust fund" claim allowed by Judge Bare is appealed on the basis of the issues set forth in Sections I, II and III of Part I of the Trustee's brief of July 7, 1980, and of this brief.

In addition, the 56 claims listed on the Exhibit to Part II of the Trustee's July 7, 1980 brief are appealed, but only as to 3 of the objections on the objection form used by the Trustee. See, Exhibit B hereto. These include objections, Nos. 8 and 11b, which are common to all 56 claims and are based upon the blanket waivers that were signed. The third is Objection No. 14, which was made to 20 of the 56 claims on the ground that those 20 claimants were professional dealers in the livestock business, themselves regulated by the Packers and Stockyards Act, and were not intended by Congress to be beneficiaries of the 7 U.S.C. § 196(b) trust. Part II of this brief addresses these 20 claims.

This withdrawing of certain issues as described above is without any intent to admit

that the withdrawn issues are without merit. Any argument or inference to the contrary would be false, and the withdrawal from appeal of some objections and issues should not be construed as affecting the objections and issues that remain appealed. For example, the Trustee is withdrawing appeals relative to "weight bill" waivers. Those waivers were executed under circumstances entirely different from blanket waivers, but in some instances the Bankruptcy Court relied on factual and/or legal conclusions made in the course of deciding the objections to "weight bill" waivers in disposing of objections to blanket waivers. In such instances where the Bankruptcy Court made common factual and/or legal conclusions, it should be understood that by withdrawal of appeals of "weight bill" waivers, the Trustee in no way waives his right to attack those common factual and/or legal conclusions when presented in the context of an appeal relative to, for example, a blanket waiver.