**In the Matter of GREAT AMERICAN VEAL, INC., Debtor.**

**FIRST INTERSTATE BANK OF CALIFORNIA, formerly United California Bank, and Tony W. De Groot, William A. Kirk, Nancy L. Rafter, Jack S. Witt, Albert Van Der Graaf, Verle G. Call, d/b/a Call & Sons Veal, Al Raposo, Joseph Lepori, Kathleen S. Willner, Barry S. Grantham, James T. Rohleen, d/b/a Triple R. Ranch, Kenneth T. Rundle, Jr. and William H. Grund, Plaintiffs,**

v.

**GREAT AMERICAN VEAL, INC., Defendant.**

**Bankruptcy No. 82–06364.**
**Adv. No. 82–0650.**

United States Bankruptcy Court,
D. New Jersey,

Oct. 18, 1985.

Shanley & Fisher by A. Dennis Terrell, Morristown, N.J., for plaintiffs.

Kleinberg, Moroney, Masterson & Schachter by Gary S. Jacobson, Millburn, N.J., for defendant.

VINCENT J. COMMISA, Bankruptcy Judge.

Plaintiffs have filed a complaint seeking damages for the conversion and fraudulent transfer of assets, which assets, the plaintiffs contend, were the subject of liens in their favor at the time of the alleged transfers.

Plaintiff, First Interstate Bank of California, formerly the United California Bank (hereinafter referred to as the Bank) is a California corporation with its principal place of business located in Los Angeles, California. Plaintiffs, Tony W. DeGroot, William A. Kirk, Nancy L. Rafter, Jack S. Witt, Albert Van Der Graaf, Verle G. Call, d/b/a Call & Sons Veal, Al Raposo, Joseph Lepori, Kathleen S. Willner, Barry S. Grantham, James T. Rohleen, d/b/a Triple R. Ranch, Kenneth T. Rundle, Jr. and William H. Grund (hereinafter referred to as the Growers unless individual reference is necessary) are individual farmers and/or stockmen residing in the states of California and Washington. The said plaintiff-growers had sold veal and veal products to a company known as Mid-West Veal, Inc., d/b/a Nagle Packing Co. (hereinafter referred to as Mid-West).

Mid-West, a California corporation located in Los Angeles, California, was engaged in the business of processing and buying and selling veal, veal products and other meats. In order to conduct its business Mid-West entered into a commercial revolving loan transaction with Interstate. Appropriate security agreements were given granting the Bank a security interest in all present and future accounts, accounts receivable, inventory, general intangibles, contract rights and equipment. The security interests were duly perfected in the State of California by Security Agreements dated May 5, 1977, October 1, 1977 and October 4, 1977 and UCC–1 filings dated April 26, 1977 and March 19, 1980. A corporate resolution to obtain credit evidenced the loan as an authorized transaction in the ordinary course of business.

Defendant-debtor, Great American Veal Inc. (hereinafter referred to as GAV) is a New Jersey corporation whose principal business is the purchase, slaughter, packaging and sale of veal and veal products.

During the course of its business operations before February 1980, GAV sold its product to distributors on credit. However, at some time in February 1980, GAV's shipments to Mid-West were changed from a credit transaction to one made on a consignment basis.

On or about March 21, 1980, GAV took over the operations of Mid-West. At the time of the takeover, Mid-West owed GAV approximately $249,205.15 for veal products previously shipped to Mid-West. The $249,205.15 amount was subsequently treated by GAV as a bad debt on its books and records. At no time was any cash, anything of monetary value or any other consideration paid to Mid-West for the transfer of its business and its assets to GAV.

Prior to the March 21, 1980, transfer of Mid-West's assets to GAV, employees of the United California Bank (UCB), predecessor of the plaintiff bank, visited the Mid-West business premises after becoming aware of Mid-West's precarious financial condition. It did not conduct a detailed inventory as it was denied access to the facility but did observe veal carcasses and fresh and frozen veal in boxes.

On or about March 12, 1980, the U.S. Packers & Stockyards Administration forwarded letters to UCB notifying it that, as a secured lender to Mid-West, statutory trust claims had been asserted by the veal growers against Mid-West and that said trust claims could apply to the same inventory upon which UCB was claiming a security interest.

Since Mid-West, in the conduct of its business, had annual purchases in excess of $500,000.00, it was subject to the provisions of the Packers & Stockyards Act of 1921, 7 U.S.C. Sec. 181, *et seq.* The Growers statutory trust interests were created pursuant to 7 U.S.C. Sec. 196(b) which, in pertinent part, provides as follows:

"All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers: PROVIDED, that any packer whose average purchases do not

exceed $500,000 will be exempt from the provisions of this section.... PROVIDED, that the unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received within thirty days of the final date for making payment under section 228b of this title, ... the seller has not preserved his trust under this subsection. The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary."

At the time Mid-West transferred its assets to GAV, cash basis purchases payments due the veal growers remained unpaid for a period greater than the statutory time period limitations. Written notice of the delinquent payments was sent to Mid-West and filed with the Secretary of the U.S. Department of Agriculture.

In the latter part of March 1980, Mid-West owed the Bank approximately $450,-000.00 which was, as previously noted, secured by all of the assets of Mid-West. On March 26, 1980 the Bank declared the loan in default and notified Mid-West's customers to pay the Bank directly. In addition to taking over the accounts receivable, the Bank attempted to take possession and control of the inventory on the Mid-West premises but was prevented from doing so at that time. Between March 26, 1980, and December 31, 1980 the Bank collected some $288,448.47 from the Mid-West accounts receivables. No collections were made.

As of December 31, 1984, by deducting the amounts collected and by adding accrued interest, the Bank's claim amounted to $310,969.49, plus additional interest.

In addition to the $163,588.04 principal, plus the interest thereon, the Bank claims an additional $190,000.00 which arose as a result of a settlement of a state court action brought by the Growers to settle the respective priorities of the Growers and the Bank to the proceeds of the accounts receivables of Mid-West.

In March of 1980, about the same time the Bank was declaring Mid-West to be in default, the U.S. Department of Agriculture, Packers & Stockyards Administration, in response to the notices filed by the Growers, sent representatives to the Mid-West. The representatives were to conduct a physical inventory as of the date of the GAV takeover and make whatever examination of the books and records was necessary to determine if the Growers' notices complied with Section 206 of the Packers & Stockyards Act to preserve the Growers' interest in the statutory trust benefits.

Meanwhile, the Packers & Stockyards Administration officials simultaneously conducted an investigation of the books and records of GAV in its New Jersey offices. The government official in control of this investigation reviewed the books and records of Mid-West and GAV and interviewed the chief operating officer of GAV regarding all of the circumstances surrounding the GAV takeover. Thomas Burke, the president and sole stockholder of GAV was unable or refused to tell the government investigator the amount of inventory in possession of Mid-West when it was taken over by GAV. Burke provided the government official with some records regarding the inventory in question but would not discuss documents which indicated there was more inventory than that listed in the records which were turned over.

The government investigator, in a telephone conversation with the account for GAV, inquired as to the Mid-West inventory. The investigator was told that the Mid-West inventory was transferred to the books of GAV. During this conversation, the telephone conversation was interrupted. After the interruption the accountant refused to give further information regarding notations on the books and records of GAV.

As to the inventory on the Mid-West premises at the time of the GAV takeover, Burke did not recall any inventory being taken. Burke did recall that there were veal calves hanging from the racks at the Mid-West facility, which carcasses were skinned, processed and sold by GAV for its own account.

Under examination, Burke was unable to testify, controvert, contradict or give any believable explanation of what happened to meat and meat products valued by one John D. Edmond, a U.S. Packers & Stockyards Administration official. Mr. Edmond, a marketing Specialist, had conducted an investigation of the inventory of Mid-West. The investigation was commenced on March 11, 1980 by the taking of a physical count of the inventory at the Mid-West Gladys Avenue facility. Mr. Edmond determined the amount of meat and meat products in the freezer and the number and weight of the veal carcasses in the cooler. As a result he determined that as of March 14, 1980 there were 142,655 pounds of veal and veal products in the inventory.

By using sales receipts which he examined, Edmond was able to place a dollar value on the meat in inventory by the use of an average value of 2.82. To determine this dollar value he examined the livestock purchase invoices for the week previous to his inspection.

Edmond also inventoried some 12,444.4 pounds of meat and meat food products allegedly received on consignment from GAV which had a product value of approximately $36,019.11.

In order to determine the true value of the inventory as of March 21, 1980, the date of the turnover, he deducted from the above totals the amount of sales made by Mid-West during the week of March 14 through March 21 and concluded that the minimum inventory as of March 21, 1980 was 120,580.7 pounds at a value of $280,118.01.

In addition to the above, there was 120,580.7 pounds of veal and veal products in the name of Mid-West at the Terminal Storage facility, which is a facility separate and apart from the Gladys Avenue facility. Edmond reviewed the records of Mid-West and concluded that an inventory totaling 63,441.4 pounds and having a value of $137,403.61 was transferred to GAV after March 21, 1980.

During the physical examination made by Edmond, he noted the absence of any markings, signs or identification that any of said meat was property of GAV.

It is noted that Edmond was denied access on two (2) occasions between March 21, 1980 and April 4, 1980, when he attempted to conduct a follow-up inventory on the premises of Mid-West.

No evidence was produced in court or offered in any way to indicate when certain property arrived in California or that GAV had an ownership interest or a valid consignment in any inventory of Mid-West on March 21, 1980.

It is clear that Burke had knowledge of the financial arrangements existing between Mid-West and the Bank. By reason of a conversation with a bank officer, Burke was also aware that the financing was secured.

GAV contends that since it sold the goods to Mid-West on consignment under state law it is entitled to a security position superior to that of the Bank. As noted herein, GAV never perfected its security interest in the consigned goods. U.C.C. Sec. 9–114, as adopted in the State of California, provides the requirements necessary to perfect such interest in consigned goods. Section 9–114 reads, in pertinent part:

(1) A person who delivers goods under a consignment which is not a security interest and who would be required to file under this Article by paragraph (3)(c) of Section 2–326 has priority over a secured party who is or becomes a creditor of the consignee and who would have a perfected security interest in the goods if they were the property of the consignee, and also has priority with respect to identifiable cash proceeds received on or before delivery of the goods to a buyer, if

(a) the consignor complies with the filing provision of the Article on Sales with respect to consignments (paragraph (3)(c) of Section 2–326) before the consignee receives possession of the goods; and

(b) the consignor gives notification in writing to the holder of the security interest if the holder has filed a financing

statement covering the same types of goods before the date of the filing made by the consignor; and

(c) the holder of the security interest receives the notification within five years before the consignee receives possession of the goods; and

(d) the notification states that the consignor expects to deliver goods on consignment to the consignee, describing the goods by item or type.

U.C.C. Sec. 9–114(2), as adopted by the State of California, provides that:

(2) In the case of a consignment which is not a security interest and in which the requirements of the preceding subsection have not been met [*see supra.* note 1], a person who delivers goods to another is subordinate to a person who would have a perfected security interest in the goods if they were the property of the debtor.

U.C.C. Sec. 9–104(a) (1981) also provides that

"This Chapter [on secured transactions] does not apply (a) to a security interest subject to any statute of the United States ... to the extent that such statute governs the rights of parties affected by transactions in particular types of property."

It is clear that GAV never gave the Bank notice in writing regarding the goods in question as required by Subsection (b) nor was any notification as required by Subsection (c) and (d) ever made or given to the Bank.

In order to determine if the requirement contained in Subsection (a) has been complied with, we look to the Article on Sales. Section 2–326(3) of the U.C.C. provides for three (3) exceptions which apply to the general rule that a secured creditor having a perfected security interest in a debtor's assets could satisfy it out of consigned goods. *See, In re Chimneys, Chimes 'N Chairs,* 17 B.R. 776, 779 (Bankr.N.D.Ohio 1982).

The three exceptions are:

(3) ... [T]his subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(c) complies with the filing provisions of the Article on Secured Transactions (Article 9). U.C.C. Sec. 2–326(3).

■ The burden is on the consignor, in this case GAV, to prove that its goods sold on consignment qualify under one of the three (3) exceptions. *In re Chimneys, Chimes 'N Chairs,* 17 B.R. 776, 779 (Bankr.N.D.Ohio 1982).

■ Here, no sign was ever displayed by Mid-West identifying the goods as consigned goods, therefore, section (a) is inapplicable. As to section (b), it is also inapplicable because Mid-West was an independent business engaged in the sale of its own processed veal and veal products. As to exception (c), it clearly does not apply as GAV never perfected its interest as a consignor as it could have pursuant to U.C.C. Sec. 9–114.

Thus it is clear that unless the exceptions provided for in the various sections of the California U.C.C. are complied with, a debtor has an interest in consigned goods that can be pledged as security for a secured loan and the holder of such secured loan has a right to satisfy its claims out of the consigned goods. *See, In re Chimneys, Chimes 'N Chairs,* 17 B.R. 776 (Bankr.N. D.Ohio 1982); *King's Appliance and Electronics, Inc. v. Citizens and Southern Bank of Dublin,* 157 Ga.App. 857, 278 S.E.2d 733 (1981).

In view of the above, this Court holds that even if state court alone governed in this matter, the Bank's security interest in the alleged consigned goods is superior to any asserted by GAV.

The more important issue to be decided is the validity and priority status of the federal statutory lien asserted by the Growers.

Here, the California and Washington veal growers meet the requirements of the

Packers & Stockyards Act, Sec. 206, 7 U.S. C.A. Sec. 196(a) (1976). The veal growers are unpaid cash sellers who timely filed the required notices of intention to enforce their rights under the Act's trust provisions. Since it is clear that Mid-West was a packer making average annual purchases over $500,000 per year, it is, therefore, subject to the Act's provisions.

In enacting the Packers and Stockyards Act, Congress specifically used the word "trust" rather than lien or secured interest to describe the growers' rights in the packers inventory, equipment, receivables, contract rights and general intangibles. By creating a statutory trust, Congress established a special fiduciary relationship between the packer and the livestock grower. The packer becomes the trustee of the statutory trust and the packer's assets become the trust's corpus.

The legislative history of the 1976 amendment to the Act makes it clear that Congress intended to establish a statutory trust whose corpus is not subject to creditors' rights even in bankruptcy proceedings. In pertinent part the amendment provides as follows:

> [I]nasmuch as this is a trust as opposed to a lien, it falls in a different category and therefore it does not substantially affect the Bankruptcy Act. A lien would fall more in the category of affecting priorities such as secured transactions as they are recognized under the Uniform Commercial Code and then take or assume a priority under the Bankruptcy Act. But a trust relationship such as that would arise as a result of section 8 [7 U.S.C. Sec. 196], I think falls outside of the purview of the Bankruptcy Act. The trust property would not become an asset in the bankruptcy proceedings. *Business Meetings of Packers and Stockyards Act of 1921, As Amended,* Committee on Agriculture, H.R., 94th Cong., 2d Sess. Dec. 1976 at 130–31.

Congress intended that the trust created under the Act be paramount to or supersede any liens or perfected security interest asserted by a bankrupt's creditors. *In re Heintzelman Construction Co.,* 34 F.Supp. 109 (W.D.N.Y.1940); *In re Frosty Morn Meats, Inc.,* 7 B.R. 988, 1001 (Bankr. M.D.Tenn.1980).

■ It is again noted that GAV never perfected a security interest in goods allegedly sold on consignment, however, even if a security interest had been credited, GAV's rights would still be subordinate to the Growers' rights under the trust. *See, Fillippo v. S. Bonaccurso & Sons, Inc.,* 466 F.Supp. 1008 (E.D.Pa.1978); *Hedrick v. S. Bonaccurso & Sons, Inc.,* 466 F.Supp. 1025 (E.D.Pa.1978). The constitutionality of the statutory trust created by the Act has been affirmed by the *Fillippo* court at 466 F.Supp. at 1008, 1012, n. 2.

Even if state law is applied the federally imposed trust would have priority over any state law on priorities. U.C.C. Sections 9–114(2) and 9–104(a) (1981) clearly provide that, where a consignee has not complied with the sections of the U.C.C. providing for recording and notice, the consignment is not secured. The California U.C.C. also provides that the U.C.C. section on secured transactions does not apply to security interests subject to statutes of the United States.

■ The next issue is the validity of the subrogation of the Growers rights under the trust. By paying the veal growers $180,000.00, the Bank's claim became subrogee to the Grower's interest and as such became the priority claimant to Mid-West's assets. *See,* 83 C.J.S. *Subrogation* Sec. 31 (1955). The validity of subrogated interests arising out of the Packers and Stockyards Act was upheld in the *Fillippo* case, *supra,* 466 F.Supp. at 1022. *See also, In re Supreme Plastics, Inc.,* 8 B.R. 730 (Bankr.N.D.Ill.1980). Accordingly, the Bank's claim as subrogee to the veal growers' superseding interest in Mid-West's converted assets is sustained.

■ As noted earlier, GAV took possession of Mid-West's assets without consideration or prior perfected security rights. This clearly was a conversion by GAV of Mid-West's assets. As a result of this con-

version, the Bank in its own right and as subrogee of the Growers' trust claims does not have to trace the proceeds of the inventory converted by GAV. *See, In re Gotham Provision Co., Inc.,* 669 F.2d 1000 (5th Cir.1982); *In re Frosty Morn Meats, Inc.,* 7 B.R. 988 (Bankr.N.D.Tenn.1980); *Chemical Bank v. Miller Yacht Sales,* 173 N.J.Super. 90, 413 A.2d 619 (App.Div.1980); *Towe Farms, Inc. v. CIPCA,* 528 F.Supp. 500 (S.D.Iowa 1981).

It is generally accepted that the buyer of property which is subjected to a perfected security interest is liable for the fair market value of the subject property and interest in that amount from the day of conversion. *See, ITT Industrial Credit Company v. H & K Machine Service Co.,* 525 F.Supp. 170 (E.D.Mo.1981). The court in the *ITT* case stated that Article 9 of the U.C.C. provided only one (1) exception to the general rule—when the buyer is one in the ordinary course of business. U.C.C. Sec. 9–307(1).

A "buyer in the ordinary course of business" is one who

"... in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interests of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind...." U.C.C. Sec. 1–201(g).

GAV cannot be a buyer in the ordinary course of business because it did not buy the assets of Mid-West, it was familiar with the statutory trust claimed by livestock growers and had actual knowledge of the perfected liens held by the Bank in the inventory, etc.

Normally, in a bankruptcy proceeding, the secured creditor may claim only those assets which are capable of being traced to his collateral. The creditor must trace to make the identification. *See,* U.C.C. Sec. 9–306(4). While certain courts, in interpreting U.C.C. 9–306(4), have applied the limitations to sales of collateral to a transferee, this interpretation cannot be applied in bankruptcy proceedings where the transfer of assets was accomplished by conver-

sion. To apply such a limitation would defeat the clear purpose of the Packers and Stockyard Act which was designed to eliminate the requirement of tracing and identification by creating a trust pool of the packer's assets.

It is also essential to note that the tracing requirements applied to property acquired through illegal conversions of a creditor's collateral would encourage debtors considering bankruptcy to convert the collateral of one creditor, liquidate it and distribute the proceeds therefrom to other creditors of its estate to the disadvantage and expense of the original secured creditor.

In this matter, it would be unconscionable for GAV to use the assets it secured by conversion from the Mid-West's insolvent estate to discharge its debts through its plan of reorganization. *See, Colliers* (15th Ed.) at para. 523.16[3].

Both the Growers and the Bank contend that they, as superior claimants, have a security interest in the goods Mid-West allegedly purchased on consignment. It is noted that GAV never perfected its alleged interest in the consigned property. This perfection must be made or, pursuant to U.C.C. Sec. 9–114, it fails to qualify as an exemption.

It has been held that a debtor had an interest in consigned jewelry that could be pledged for security for its loan and that a bank having a perfected security interest in the debtor's assets could satisfy it out of consigned goods. *See also, In re Chimneys, Chimes 'N Chairs.* 17 B.R. 776 (Bankr.N.D.Ohio 1982). In *Chimneys, Chimes 'N Chairs,* the Court held that unless one of the three exceptions specifically set forth under U.C.C. Sec. 2–326(3) is satisfied goods bought on consignment are subject to a creditor's security interest. *Id.* at 779.

Based upon the foregoing, the Court finds that First Interstate Bank of California's security interest in the subject consigned goods is superior to any interest held by Great American Veal, Inc. Great

American Veal, Inc. is, therefore, liable to First Interstate Bank of California in the sum of $280,118.01 for physical inventory and $137,403.61 in storage meat and food products.

Submit an appropriate Order.